**A.W. ANDERSON, et al., Plaintiffs,**

v.

**CHEVRON CORPORATION and Chevron, U.S.A., Inc., Defendants.**

**CHEVRON U.S.A., INC., Counterclaim– Plaintiff,**

v.

**A.W. ANDERSON, et al., Counterclaim– Defendants.**

**CHEVRON U.S.A., INC., Third Party Plaintiff,**

v.

**James C. PAYNE, et al., Third Party Defendants.**

Civ. A. Nos. 93–2254, 94–0331 (RCL).

United States District Court, District of Columbia.

Aug. 5, 1996.

William L. Taylor, Taylor, Thiemann & Aitken, Alexandria, VA, for Plaintiffs; Counterclaim–Defendants; and Third–Party Defendants.

Deborah Mindy Lerner, James Arthur Meade, Pillsbury, Madison & Sutro, Washington, DC, W. Todd Miller, Baker, Miller, P.L.L.C., Washington, DC, for Defendants; Counterclaim Plaintiffs; and Third–Party Plaintiffs.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This matter comes before the court on a motion for summary judgment filed by defendant Chevron with respect the following: (1) plaintiffs' claims under the Petroleum Marketing Practices Act (the "PMPA"), 15 U.S.C. §§ 2801–2841; (2) plaintiffs' common law claims; and (3) defendant's counterclaims against certain named plaintiffs and third-party defendants.[1] Upon consideration

---

1. This consolidated case originated from two cases filed in different jurisdictions. *Anderson v. Chevron U.S.A., Inc.*, Civil Action NO. 92–2254, was originally filed in the District of Columbia in October 1993. By contrast, *JCP, Inc. v. Chevron U.S.A., Inc.*, Civil Action No. 94–331, which arose out of the same set of facts and involved common parties with similar claims, was originally filed in the Eastern District of Virginia. *JCP, Inc. v. Chevron U.S.A., Inc.* was transferred to the District of Columbia in February 1994, and consolidated with *Anderson v. Chevron U.S.A., Inc.* in the following month. *See* Court's Stipulated Order of March 3, 1994.

of filings of counsel, defendant's motion for summary judgment shall be granted with respect to plaintiffs' statutory claims, plaintiffs' common law claims, and defendant's counterclaims. The court's reasoning is set forth below.

## BACKGROUND

### A. The Parties

Defendant Chevron is a refiner and marketer of petroleum products. On October 14, 1992, Chevron entered an agreement with Exxon Corporation ("Exxon") to exchange certain Chevron service stations in the Baltimore, Maryland, Washington, D.C., and Norfolk, Virginia areas ("collectively, the "Mid–Atlantic Area") for certain Exxon service stations in southern Florida. This exchange of assets between Chevron and Exxon represented Chevron's near complete withdrawal from the Mid–Atlantic petroleum market.

Plaintiffs are twelve service stations dealers [2] who leased their stations or purchased motor fuel from Chevron at the time of the exchange. Plaintiffs allege that Chevron renewed or entered into franchise agreements with each plaintiff *after* Chevron had decided to withdraw from the Mid–Atlantic area, and *after* "the occurrence of changes in relevant facts and circumstances" upon which Chevron based its determination to withdraw, in violation of the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2802(b)(2)(E)(i).[3] In the present motion, defendant Chevron seeks summary judgment with respect to these claims.

Four of these plaintiffs—Charles W. Blanchard, Diversified Business Co., Inc., JCP, Inc., and Harry M. Land, Jr.—also allege that Chevron committed common-law fraud based on misrepresentations made by Chevron employees regarding Chevron's long-term marketing plans in the Mid–Atlantic area. In their complaint, these four plaintiffs also claimed that Chevron's actions violated an implied covenant of good faith and fair dealing. Recently, however, the Virginia Supreme Court in *Mahoney v. NationsBank of Virginia, N.A.,* 249 Va. 216, 455 S.E.2d 5 (1995), ruled that a person cannot have violated the implied covenant of good faith and fair dealing where that person acted in a manner specifically provided for by the express terms of a subsequent written agreement. *See id.* 455 S.E.2d at 8–9. Plaintiffs concede that this case is dispositive, and that in light of this decision, their implied covenant claims must fail. Accordingly, the court shall enter summary judgment for defendant on the implied covenant claim, and consider only whether plaintiffs' common law fraud claims survive defendant Chevron's motion for summary judgment.

Finally, defendant Chevron filed counterclaims against six plaintiffs—A.W. Anderson, Wilson Beach, Charles W. Blanchard, Diversified Business Co., Inc., JCP, Inc., and Harry M. Land, Jr.—who allegedly refused to honor their contractual obligations to pay Chevron for rent, motor fuel and other products. In addition, Chevron has named the guarantors of two the plaintiffs' obligations—James C. Payne, Jr., as guarantor for JCP, Inc., and Emmitt Short, as guarantor for Diversified Business Co., Inc.—as third-party defendants. Defendant also moves for summary judgment with respect to these third-party claims.

### B. Defendant Chevron's Withdrawal From the Mid–Atlantic Market

According to plaintiffs, defendant Chevron first began to explore the possibility of withdrawal from the Mid–Atlantic market area in the mid–1980's. In October of 1985, Chevron received a bid from Mobil for its Mid–Atlantic assets. Chevron, however, rejected Mo-

---

**2.** At the time of the filing of defendant's motion, there were fourteen plaintiffs participating in this litigation: Harry Land, Jr.; Charles Blanchard; Richard S. Proffitt; JCP, Inc.; Diversified Business Co., Inc.; Carl Lotto; Surrinder Chase; Chien Chih Lu; Carlos Bonds; Wilson Beach; Benjamin Simpson; Star Bros. Inc.; and A.W. Anderson. The claims filed by two of these plaintiffs—Chien Chih Lu and Carlos Bonds—

were subsequently dismissed with prejudice. *See* Court's Stipulation and Order of May 17, 1995.

**3.** The parties have stipulated that Chevron complied with all other requirements of the PMPA and its market withdrawal provision. *See* Joint Stipulation and Order of March 23, 1995, at ¶ 2–3.

bil's bid, and chose to remain in the Mid–Atlantic market area.

In July of 1991, Chevron again began to explore the possibility of a sale or exchange of its Mid–Atlantic assets. Chevron conducted a number of studies to determine the feasibility of market strategy that would include market withdrawal from the Mid–Atlantic area.[4] On July 18, 1991, Chevron's Executive Committee authorized Chevron's Marketing Department to determine the market value of Chevron's Mid–Atlantic assets and to explore the possibility of whether an attractive exchange might be available.

A planning group within Chevron's Marketing Department subsequently analyzed the company's options, and on October 17, 1991, recommended to the Chairman of Chevron's Board of Directors that Chevron test the feasibility of trading its Mid–Atlantic assets for similar assets in Florida.[5] It is undisputed that, at this time, Chevron's Mid–Atlantic assets were operating profitably, and that Chevron would continue its operations in this area in the event that Chevron was unable to find a suitable buyer or exchange party.

Chevron approached Mobil in October 1991 to determine whether Mobil had any interest in discussing the possibility of an exchange of assets. In December 1991—while Chevron awaited a response from Mobil representatives—Exxon inquired whether Chevron would be interested in an exchange of Chevron's Mid–Atlantic assets for similar Exxon assets in southern Florida. Chevron declined to pursue discussions with Exxon in light of its ongoing discussions with Mobil. On January 16, 1992, however, Mobil advised Chevron that it was not interested in exchanging assets. As a result, Chevron's planning group resumed discussions with Exxon.

On February 6, 1992, Chevron sent Exxon a list of all Chevron assets in the Mid–Atlantic area to assist Exxon in its determination whether to present an exchange offer to Chevron. On February 14, 1992, Exxon sent Chevron a list of all its Florida assets, and the parties entered into a confidentiality agreement on February 27, 1992.

Although Exxon had not yet made an offer to Chevron, the parties continued to evaluate internally their interests in the proposed exchange. Finally, on or about July 10, 1992, Exxon proposed an exchange of approximately sixty Exxon stations in southern Florida for sixty Chevron stations in the Mid–Atlantic area. Over the next few days, Chevron's planning group and Marketing Department reviewed the Exxon proposal, and made a preliminary determination to present the Exxon offer to Chevron's Board of Directors. On July 13, 1992, Chevron stopped renewing or entering into agreements with dealers in the Mid–Atlantic area.

Negotiations between Chevron and Exxon continued throughout the remainder of the month, and on August 6, 1992, the working Exxon proposal was presented to Chevron's Executive Committee. Chevron's Executive Committee authorized further negotiations,

---

4. According to plaintiffs, Chevron's market strategy was premised on concentrating capital in "core markets" at levels no less than 12%—18% in order to achieve a higher efficiency of return on capital and increased profitability. As of July 1991, Chevron's respective market share in the different segments of the Mid–Atlantic market area were as follows: Virginia—7.9%; Maryland—3.9%; and District of Columbia—8.7%.

5. According to defendant Chevron, the recommendation that Chevron study the feasibility of exchanging some of its Mid–Atlantic area stations for Florida stations was based on the planning group's view that: (1) a Mid–Atlantic/Florida exchange might be the best way to maximize the perceived competitive advantage that Chevron enjoyed by supplying its southern Florida service stations through its Pascagoula, Mississippi refinery; (2) although the Mid–Atlantic market was attractive and profitable, Chevron's market share would have to grow in order to further develop customer loyalty and trademark recognition, and to support an advertising program; (3) in order to be a long-term, strong competitor in the Mid–Atlantic market, Chevron would have to invest significant capital to maintain and modernize its stations to comply with various environmental regulatory requirements; (4) an exchange arrangement might effectively allow Chevron to translate a portion of its Mid–Atlantic assets into the Florida market, thereby offsetting a portion of the capital that would otherwise be needed to invest in Florida; and (5) an exchange of property—as opposed to a direct acquisition of Florida stations—would allow Chevron to take advantage of certain tax benefits. *See* Reeves Decl., at ¶ 7.

and on October 1, 1992, the Board authorized the final negotiation and execution of the proposed exchange agreement. The exchange agreement was executed on October 14, 1992.

At the time of execution of the exchange agreement, all of the plaintiffs, with the exception of Richard Moore,[6] were Chevron licensees operating under three-year franchise agreements that were identical in all relevant respects. Moreover, all the franchise agreements between plaintiffs and defendant Chevron, with the exception of Richard Moore, were entered into or renewed on or before May 20, 1992.[7]

## ANALYSIS

### A. Standard of Review

■ Summary judgment is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). If summary judgment is to be denied, there must be evidence on which the jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). If the non-moving party

6. Richard Moore did not become a Chevron franchisee until he became the assignee of the Holland Road station in February 1993—two months after Chevron announced its withdrawal from the Mid–Atlantic area. *See* Letter of January 25, 1993, from Richard S. Proffitt from D.E. Reiss.

7. The following chart sets out the undisputed entry or renewal date for each of plaintiffs' franchises:

| Plaintiff | Date |
| --- | --- |
| Harry Land, Jr. | 12/27/89 |
| Charles Blanchard | 10/10/90 |
| Richard S. Proffitt | |
|     Newton Rd. | 04/11/90 |
|     733 Independence Blvd. | 09/30/91 |
|     Holland Rd. (Richard Moore) | 11/28/89 |
| JCP, Inc. | |
|     Towne Point Rd. | 10/30/90 |
|     Diamond Springs Rd. | 05/22/91 |

"fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment may be granted. *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

### B. Alleged Violation of the Market Withdrawal Provision of the PMPA

#### 1. The PMPA

■ Congress enacted the PMPA to prevent the arbitrary, pretextual or discriminatory cancellation of fuel marketing franchises. *See* S.Rep. No. 731, 95th Cong., 2d Sess. 15, 19, *reprinted in* 1978 U.S.C.C.A.N. 873, 877, 896. "Congress was primarily concerned with franchisors' use of the threat of termination to force franchisees to comply with corporate marketing policies." *See May–Som Gulf, Inc. v. Chevron, U.S.A., Inc.*, 869 F.2d 917, 921 (6th Cir.1989). In doing so, however, Congress drafted the PMPA in a manner that attempts to strike a careful balance between the rights of franchisors and the rights of franchisees. Thus, while limiting the right of franchisors to terminate or refuse to renew their dealers franchises, the Act also recognizes and protects franchisors' rights to discontinue franchises where justified by legitimate business reasons. As this Circuit correctly observed in *Lewis v. Exxon Corp.*, 716 F.2d 1398 (D.C.Cir.1983):

> Although the PMPA attempts to prevent arbitrary and unreasonable terminations, it

| Diversified | |
| --- | --- |
|     Denbigh & Jefferson | 02/04/91 |
|     Armistead Ave. | 08/11/91 |
|     Newport Square | 04/07/92 |
| Carl Lotto | 02/20/91 |
| Surrinder Chase | 08/17/91 |
| Chien Chih Lu* | 08/17/91 |
| Carlos Bonds* | 10/30/91 |
| Wilson Beach | 12/15/91 |
| Benjamin Simpson | 02/13/92 |
| Star Bros. Inc. | 02/13/92 |
| A.W. Anderson | 05/20/92 |

*See* Joint Stipulation and Order of March 27, 1995, at ¶ 5 and Schedule A.

Schedule A, as filed with the Court's Order, lists Chien Chih Lu and Carlos Bonds as plaintiffs along with the corresponding dates upon which their franchise agreements were either initiated or renewed. The court, however, subsequently dismissed both of their claims with prejudice. *See* Court's Stipulation and Order of May 17, 1995.

also seeks to preserve intact the franchisor's legitimate freedom to choose with whom it will deal. The one goal is as important as the other. The object is balance.

*Id.* at 1399.

Under the PMPA, any franchisor subject to the Act is prohibited from terminating or failing to renew existing franchises unless such termination or non-renewal is conducted in accordance with the express requirements of the PMPA. At issue in the instant matter is whether defendant Chevron complied with the market withdrawal provision of the PMPA when it entered into the asset exchange agreement with Exxon that resulted in Chevron's termination of existing franchise agreements with local dealers and Chevron's near complete withdrawal from the Mid–Atlantic market. Under the market withdrawal provision, Chevron may terminate existing franchises only if Chevron's determination to withdraw from the market *and* the occurrence of changes in relevant facts and circumstances upon which that determination was based had taken place *after* Chevron entered into or most recently renewed plaintiffs' franchises. *See* 15 U.S.C. § 2802(b)(2)(E)(i).[8]

### 2. Summary Judgment on Plaintiffs' PMPA Claims

■ Defendant Chevron argues that it complied fully with the franchise termination provision of the PMPA, and that its decision to withdraw from the Mid–Atlantic market "(I) was made *after* the date that [the franchise agreements were] entered into or renewed, and (II) was based upon the occurrence of changes in relevant facts and circumstances *after* [the date of the franchise agreements]." 15 U.S.C. § 2802(b)(2)(E)(i) (emphasis added). In construing the language of a statute, this court begins its inquiry with the language of

the statute itself. *See United States v. Ron Pair Enterprises,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989). Where the statutory language is plain, the plain meaning of the text provides the appropriate interpretation of the statute, and the court's " 'sole function ... is to enforce it according to its terms.' " *Id.* (quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917)).

In this case, however, the statutory language "decision to withdraw" cannot be understood as having a plain or fixed meaning. The reality of corporate decisionmaking is that there is no single, universal and steadfast method by which corporations make their decisions. Thus, a court's determination as to the moment at which a withdrawal decision occurred necessarily entails a case-by-case analysis conducted in accordance with the realities of corporate decisionmaking.

■ Pinpointing the withdrawal decision is further complicated by competing policy considerations embodied in the PMPA itself. The PMPA attempts to reconcile two conflicting aims—(1) to protect franchisees' reasonable expectations and (2) to insure that distributors retain adequate flexibility to respond to changing market conditions and consumer preferences. The court's interpretation of the market withdrawal provision must reflect the balancing of these competing interests. Thus, a court's determination regarding the occurrence of a withdrawal decision in the relatively fluid context of corporate decisionmaking is further complicated by the necessity of having that determination be consistent with the balance set forth in the PMPA.

In *Florham Park Chevron, Inc. v. Chevron,* Bus Franchise Guide (CCH) ¶ 9012, at 18,422 (D.N.J.1987), a district court, in mak-

---

8. 15 U.S.C. § 2802(b)(2)(E)(i) sets forth the following basis upon which a franchise relationship may be permissibly terminated:

[E] determination made by the franchisor in good faith and in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market in which the market premises are located, if—

(i) such determination—

(I) was made after the date such franchise was entered into or renewed, and

(II) was based upon the occurrence of changes in relevant facts and circumstances after such date....

*Id.*

ing this determination, found that conditional acceptance of a bid pending execution of a final agreement by a Board of Directors constituted a decision to withdraw. *See id.* at 18,425. The issue in *Florham Park* was whether Chevron complied with the market withdrawal provision of PMPA when it transferred certain service station leases to Cumberland Farms as part of Chevron's withdrawal from the New Jersey, Delaware, and Pennsylvania markets. The *Florham Park* court found that Chevron's determination to withdraw came on November 7, 1985, when the Board of Directors conditionally accepted Cumberland's bid pending execution of a final agreement. Moreover, the *Florham Park* court explicitly rejected the argument that recommendations by market strategists within the corporation constituted a decision withdraw. As the court properly observed:

> The [Board of Directors] was the entity within Chevron authorized to make this determination. The recommendation of the "study team" did not bind the board.... Therefore, earlier actions by the "study team"—such as its April 1985 contact with prospective buyers or its June 1985 mailing of bid instructions and draft agreements—did not constitute a determination to withdraw by Chevron.

*Id.* at 18,425.

The rule adopted by the *Florham Park* court appears to be a sound one. Accordingly, this court finds that the decision to withdraw from the Mid–Atlantic area was made no earlier than October 1, 1992, the day when the Board of Directors of defendant Chevron tentatively approved the proposed exchange of assets with Exxon, and instructed Mr. Reeves to negotiate an execute a final exchange agreement. It is undisputed that no franchise agreement had been initiated or renewed after May 20, 1992. *See* Joint Stipulation and Order of March 27, 1995, at ¶ 5 and Schedule A. Because Chevron's decision to withdraw from the Mid–Atlantic area was made several months after Chevron initiated or renewed the last of plaintiffs' franchise agreements, the court finds that defendant had not violated the first of the two-prong test of the market withdrawal provision of the PMPA.

The court also finds that Chevron's decision to withdraw from the Mid–Atlantic market was based upon "changes in relevant facts and circumstances" that occurred *after* the last of plaintiffs' franchise agreements had been initiated or renewed. 15 U.S.C. § 2802(b)(2)(E)(i). Traditionally, courts have identified the existence of a willing and acceptable buyer as the critical change in circumstances for purposes of the PMPA. In *Florham Park,* a Chevron study team approached various potential buyers of its refining and marketing assets in the northeastern United States. *See id.* at 18,425. The study team informed the potential buyers that only Chevron's Board of Directors had authority to approve a sale. On September 20, 1985, Chevron sent potential buyers bidding instructions and drafts of sales agreements. Cumberland Farms submitted a bid, and on November 7, 1985, Chevron's Board of Directors tentatively accepted Cumberland's bid, subject to the execution of a final agreement. Chevron and Cumberland executed a final sales agreement on December 19, 1985.

The *Florham Park* court ruled that "the presence of Cumberland Farms as willing buyer constituted the 'change in relevant circumstances' upon which Chevron's withdrawal determination was based." *Id.* at 18,426. The court also observed that recognizing any earlier date would interfere with the legitimate business decisions of franchisors in a way that Congress never intended. The court reasoned:

> Any large franchisor who contemplates withdrawal and sale to another franchisor initially acts in response to some economic stimulus.... However, some substantial period of time will elapse before a final determination to withdraw and sell to a particular buyer will be made, if at all. During that interim period, the withdrawing franchisor may have dozens of franchises coming up for renewal. If the franchisor fails to renew at that time, the franchisee must receive a bona fide offer or a right of first refusal. If the franchisor renews at that time, and the economic stimulus constitutes "changed circumstances," the market withdrawal provision

will be unavailable as to that franchisee— that franchisee must also receive an offer or a right of first refusal. In either event, the withdrawing franchisor most likely will be unable to sell these franchises to any prospective purchaser. Market withdrawal by sale ... would be difficult, if not impossible. *The court finds that Congress did not intend to so limit the withdrawing franchisor.*

*Id.* at 18,426 (citations omitted) (emphasis added).

In *May–Som Gulf, Inc. v. Chevron, U.S.A.,* 869 F.2d 917 (6th Cir.1989), the Sixth Circuit addressed a similar challenge to a termination accompanying Chevron's decision to withdraw from the Ohio area. The *May–Som* litigation arose out of Chevron's efforts to reduce debt incurred in acquiring Gulf Oil by soliciting a purchaser for the former Gulf assets in Ohio. *See id.* at 919. The Chevron study team began contacting various potential buyers in the summer of 1986. On August 26, 1986, Chevron's Board of Directors conditionally accepted a bid from Cumberland Farms for these assets, subject to the negotiation and execution of a formal purchase and sale agreement. Chevron and Cumberland signed the agreement on October 15, 1986, notified the affected dealers on November 18, 1986, and closed the deal on December 1, 1986. *See id.*

In affirming the lower court's grant of summary judgment for Chevron, the Sixth Circuit concluded, in relevant part, that " 'the changed facts and circumstances [on which Chevron's decision to withdraw from the Ohio market was based] ... were that Cumberland offered to purchase [Chevron's] assets and Chevron accepted the offer.' " *May–Som,* 869 F.2d at 926 (quoting lower court's opinion). The court then ruled that until Chevron's Board of Directors had determined that Cumberland was a suitable buyer, Chevron was free to renew or enter into the franchise agreements that were

eventually terminated when Chevron later withdrew from the Ohio market.

Although this case involves an asset exchange and not a sale, the reasoning in *Florham Park* and *May–Som* is clearly applicable. The critical change in facts that led to Chevron's withdrawal from the Mid–Atlantic area was the existence of Exxon as a willing and acceptable asset exchange partner.[9] Defendant asserts that the earliest moment at which Chevron determined that Exxon was a suitable exchange partner was on July 10, 1992, when Exxon first presented the exchange offer to Chevron. Although plaintiffs argue that Chevron made efforts prior to July 1991 to develop a marketing strategy that could possibly include withdrawal from the Mid–Atlantic area, plaintiffs do *not* contest the timing of the exchange offer. It is undisputed that no franchise agreement had been either initiated or renewed after May 20, 1992. Because Chevron's decision to withdraw from the Mid–Atlantic area was based on changes in relevant facts and circumstances that occurred over a month after Chevron initiated or renewed the last of plaintiffs' franchise agreements, the court finds that defendant had not violated the second prong of market withdrawal provision of the PMPA.

In sum, the court finds, based on undisputed facts, that defendant Chevron's decision to withdraw from the Mid–Atlantic market was (1) made *after* the date that the franchise agreements were entered into or renewed, and (2) based upon the occurrence of changes in relevant facts and circumstances *after* the date of the franchise agreements. Accordingly, the court shall grant defendant's motion for summary judgment on plaintiff's claims for alleged violation of the market withdrawal provision of the PMPA.

### C. Common Law Fraud Claims

▮▮▮ Four of the plaintiffs—Charles W. Blanchard, Diversified Business Co., Inc., JCP, Inc., and Harry M. Land—also assert

---

**9.** This is the earliest practical equivalent event to the bid receipt that the courts in *Florham Park* and *May–Som* characterized as the relevant change in circumstances underlying Chevron's withdrawal decision. Just as the submission of Cumberland's bid in *Florham Park* presented the

first opportunity for Chevron to make a determination to withdraw from areas in the northeast, the Exxon exchange offer represented the first realistic possibility for Chevron to withdraw from the Mid–Atlantic area.

common law fraud claims. All four of these plaintiffs allege that Chevron committed actual fraud based on misrepresentations made by Chevron employees regarding Chevron's long-term marketing plans in the Mid–Atlantic area. To establish actual fraud under Virginia law,[10] a plaintiff must show by clear and convincing evidence: (1) a false representation; (2) of a material fact; (3) made intentionally and knowingly; (4) with intent to mislead; (5) reasonable reliance by the party misled; and (6) resulting damage to the party misled. *See Evaluation Research Corp. v. Alequin,* 247 Va. 143, 439 S.E.2d 387, 390 (1994); *Metrocall v. Continental Cellular,* 246 Va. 365, 437 S.E.2d 189, 193–94 (1993). In addition, plaintiff Diversified alleges that defendant Chevron committed constructive fraud by misrepresenting its plans for the market areas in which Diversified's stations were located.[11] "Constructive fraud differs from actual fraud in that the misrepresentation of material fact is not made with the intent to mislead, but is made innocently or negligently although resulting in damage to the one relying on it." *Evaluation Research,* 439 S.E.2d at 390.

In this case, plaintiffs' fraud claims fail as a matter of law because there is no evidence that the alleged representations made by defendant's employees were in fact false at the time they were made. With respect to the actual fraud claim, plaintiffs in this case have introduced *no evidence* that Chevron made any decision to withdraw from the Mid–Atlantic area at that time. Rather, plaintiffs speculate that "[s]ometime between the mid–1980's and July, 1991, Chevron had embraced a new marking strategy as to capital deployment" that was somehow inconsistent with Chevron remaining in the Mid–Atlantic area. Pls.'s Opp II, at 27.

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment may be entered "against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Plaintiffs' boldly unsupported assertion is plainly insufficient to survive summary judgment. As the Supreme Court made unmistakably clear in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986):

> [T]he inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits.... The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff.

*Id.* at 252, 106 S.Ct. at 2512. Although it is true that a court should consider inferences, and view such inferences in the light most favorable to the non-moving party, *Adickes,* 398 U.S. at 157, 90 S.Ct. at 1608, such inferences must be grounded in fact—not in mere speculation or conjecture. In light of plaintiffs' failure to present any affirmative evidence of a material dispute concerning the falsity of the alleged representations, the court must grant defendant summary judgment on plaintiffs' fraud claim.

But even if plaintiffs presented evidence that Chevron employees did misrepresent Chevron's marketing strategy in the Mid–Atlantic area, it appears that reliance on those representations would not be reasonable under the circumstances. At the time plaintiffs entered their franchise agreements

---

**10.** All four plaintiffs are residents of the Commonwealth of Virginia, and all of the franchises discussed in the fraud claims are located in Virginia. Virginia common law therefore is controlling.

**11.** Diversified alleged in its complaint that defendant Chevron's employees also misrepresented the reasonable gallonage ability of one of its retail outlets, and made allegedly false representations about road construction projects planned in the City of Newport News. *See* Compl. at ¶¶ 13, 17, and 18. Defendant construed these allegations as a separate fraud claim, and moved for summary judgment accordingly. Plaintiffs, however, point out in their opposition that these representations were not discussed in the enumerated fraud claims and "do not form the basis for such claims." Pls.'s Opp. II, at 36. Accordingly, the court shall consider only the allegations of misrepresentations made by Chevron employees with respect to marketing in the Mid–Atlantic area.

with Chevron, each plaintiff received and acknowledged franchise documents which stated: (1) that Chevron could withdraw from the Mid–Atlantic area in compliance with the PMPA provided that it gave plaintiff the required notice; (2) that in light of constantly changing market conditions, there was no guarantee that Chevron would remain in the Mid–Atlantic market for *any* specific length of time; (3) that *no* Chevron employee was authorized to give any assurances to franchisees concerning Chevron's intention to market in the Mid–Atlantic area; and (4) that the documents containing these plain statements constituted the agreements that set out the parties' rights and obligations.[12] Plaintiffs concede that the alleged misrepresentations were not made until *after* the franchise agreements were executed, and *after* plaintiffs received explicit notice that no guarantees could be made regarding Chevron's period of marketing in the Mid–Atlantic area, and that no Chevron employee was authorized to make such representations. Under these circumstances, it appears that, to the extent that plaintiffs relied on any Chevron employees' representations as to a purported long-term marketing in the Mid–Atlantic, such reliance was unreasonable as a matter of law. *See Evaluation Research,* 439 S.E.2d at 390 ("A finding of either actual or constructive fraud requires clear and convincing evidence that one has represented as

true what is really false, in such a way as to induce a *reasonable* person to believe it...."); *Metrocall,* 437 S.E.2d at 193–94 (holding that "to establish fraud it is essential that the defrauded party demonstrates the right to reasonably rely upon the misrepresentation").

### D.   Defendant's Counterclaims

Defendant Chevron also seeks summary judgment on its counterclaims against plaintiffs A.W. Anderson, Wilson Beach, Charles W. Blanchard, Diversified Business Co., Inc., JCP, Inc., and Harry M. Land, Jr., and third-party defendant guarantors James C. Payne, Jr. and Emmitt Short, in the amount of $118,840.72 for nonpayment for rent, fuel, service station equipment, and related charges. It is undisputed that these named plaintiffs/counterclaim defendants and third-party defendant guarantors have not paid the alleged counterclaim debts. *See* Answer to Def.'s Countercl., at 2–6; Answer to Third Party Compl., at 2–3. Furthermore, plaintiffs concede that "but for off-setting liability of Chevron, if any, under the claims asserted [in plaintiffs' Complaint], the subject dealers are liable to Chevron for the outstanding balances on their trade accounts." Pls.'s Opp. I., at 1, n. 1. The court having found that defendant Chevron is not liable to plain-

---

**12.**   Prior to executing their franchise agreements, plaintiffs received a disclosure form, as required under Virginia law, which stated in relevant part:

> All obligations of the Dealer are described in the agreements listed below ... which it is proposed that Chevron and the Dealer enter into. Copies of these agreements are attached hereto, and the Dealer should study all of these agreements carefully before signing any of them.

> Disclosure to Prospective Chevron Dealers.

Among the attached documents were the lease and supply agreements, which contained the following provision discussing Chevron's right to terminate the franchise as part of market withdrawal:

> If during the term hereof [Chevron] decides to withdraw from marketing motor fuels through retail outlets in the relevant geographic market area in which the premises are located, [Chevron] may terminate this Lease [or Contract] by giving Dealer one hundred eighty (180) days' prior written notice of such termination and otherwise complying with any applicable requirements of law, including the [PMPA].

Dealer Lease, at ¶ 7(c); Dealer Supply Contract, at ¶ 7(c). In addition, each of the four complainants received a Strategic Network Plan ("SNP") letter from Chevron that contained the following language:

> The SNP is a planning document which seeks to identify where Chevron service stations are today and where they should be in both the short term and the long term to achieve Chevron's marketing goals.... The SNP is a working document ... and is constantly undergoing revision in light of changing circumstances. *The fact that a station is in a particular category today does not necessarily mean that it will be in the same category next year, or even next month.... [T]here is no assurance that Chevron will in fact retain any of its present service stations for any specific period of time, an no Chevron employee is authorized to give any such assurances to you or to any other dealer or prospective dealer....*

SNP Letter, at 1–2.

tiffs under either the PMPA or the common law as a result of Chevron's withdrawal from the Mid–Atlantic market, and plaintiffs having no basis upon which to offset the outstanding balances on their trade accounts, the court shall also grant defendant Chevron's motion for summary judgment on counterclaims against plaintiffs and third-party defendant guarantors, and shall enter judgment for defendant Chevron in the amount of $118,840.72.

## CONCLUSION

An accompanying Order summarizing the resolution of this case shall issue this date.

## ORDER AND JUDGMENT

For the reasons stated in the accompanying memorandum opinion, it is hereby

ORDERED that defendant Chevron's motion for summary judgment on plaintiffs' statutory claims under the Petroleum Marketing Practices Act ("PMPA") and on plaintiffs' common law claims is GRANTED, and plaintiffs' claims against Chevron are hereby DISMISSED WITH PREJUDICE; and it is further

ORDERED that defendant Chevron's motion for summary judgment on defendant's counterclaims against plaintiffs is GRANTED. Judgment is hereby entered for defendant Chevron in the amount of $118,840.72 as follows:

a. Judgment is hereby entered for defendant Chevron and against plaintiff/counterclaim-defendant Anderson in the amount of $21,590.14, plus prejudgment interest and postjudgment interest thereon at the maximum lawful rate, costs, and reasonable attorney's fees;

b. Judgment is hereby entered for defendant Chevron and against plaintiff/counterclaim-defendant Beach in the amount of $16,560.04, plus prejudgment interest and postjudgment interest thereon at the maximum lawful rate, costs, and reasonable attorney's fees;

c. Judgment is hereby entered for defendant Chevron and against plaintiff/counterclaim-defendant Blanchard in the amount of $1,470.30, plus prejudgment interest and postjudgment interest thereon at the maximum lawful rate, costs, and reasonable attorney's fees;

d. Judgment is hereby entered for defendant Chevron and against plaintiff/counterclaim-defendant Diversified Business Co., Inc. in the amount of $25,523.35, plus prejudgment interest and postjudgment interest thereon at the maximum lawful rate, costs, and reasonable attorney's fees;

e. Judgment is hereby entered for defendant Chevron and against plaintiff/counterclaim-defendant JCP, Inc. in the amount of $31,501.62, plus prejudgment interest and postjudgment interest thereon at the maximum lawful rate, costs, and reasonable attorney's fees;

f. Judgment is hereby entered for defendant Chevron and against plaintiff/counterclaim-defendant Land in the amount of $22,195.27, plus prejudgment interest and postjudgment interest thereon at the maximum lawful rate, costs, and reasonable attorney's fees; and it is further

ORDERED that defendant's motion for summary judgment on Chevron's claims against third-party defendants James C. Payne (guarantor for JCP, Inc.) and Emmitt Short (guarantor for Diversified Business Co., Inc.) is GRANTED. As guarantor for JCP, Inc., James C. Payne shall pay Chevron the amount of $31,501.62, unless said amount is paid by JCP, Inc. As guarantor for Diversified Business Co., Inc., Emmitt Short shall pay Chevron the amount of $25,523.35, unless said amount is paid by Diversified Business Co., Inc.; and it is further

ORDERED that, upon oral communication with counsel for both parties as to the sealed nature of the material discussed herein, and upon consent by the parties, the Court's Order of November 16, 1994 sealing materials pertaining to this matter is hereby VACATED, and all previously sealed materials shall become part of the public record of this case.

This case now stands CLOSED upon entry of this final judgment.

SO ORDERED.