STOP–N–GO OF MADISON, INC., and Rockford Stop–N–Go, Inc., Plaintiffs–Appellants,

v.

UNO–VEN CO., and PDV Midwest Refining, LLC, Defendants–Appellees.

No. 98–3941.

United States Court of Appeals, Seventh Circuit.

Argued April 9, 1999.

Decided July 13, 1999.

Michael P. Erhard (argued), Reinhart, Boerner, Van Deuren, Norris & Rieselbach, Madison, WI, for Stop–N–Go of Madison, Inc., Rockford Stop–N–Go Inc., Plaintiff–Appellants.

Scott C. Solberg, Sidley & Austin, Chicago, IL, Thomas M. Pyper, Madison, WI, for UNO–VEN Co., Defendant–Appellee.

Scott C. Solberg (argued) Sidley & Austin, Chicago, IL for PDV Midwest Refining, L.L.C., Defendant–Appellee.

Before BAUER, FLAUM, and ROVNER, Circuit Judges.

FLAUM, Circuit Judge.

Stop–N–Go of Madison, Inc., and Rockford Stop–N–Go, Inc. (together, "Stop–N–Go") operate a chain of convenience stores and retail gas stations in Southern Wisconsin and Northern Illinois. In 1996, Uno–Ven Company ("Uno–Ven"), a refiner and distributor of "76" brand gasoline, sought to become Stop–N–Go's exclusive supplier by promising to aggressively market the "76" brand in the Midwest and by paying $1 million in advance incentives. Stop–N–Go accepted the offer and terminated its existing fuel supply contract with Francois Oil Company ("Francois"). Less than a year later, however, Uno–Ven lost the rights to the "76" brand, effectively terminating all its supply agreements. Stop–N–Go then sued claiming, among other things, that Uno–Ven had fraudulently induced it to enter the exclusive agreement and had tortiously interfered with the Francois contract. The district court granted summary judgment in favor of Uno–Ven on both theories, holding that the evidence did not support the alleged misrepresentation. We now affirm.

## Background

### Stop–N–Go

Approximately thirty-four of Stop–N–Go's convenience stores in Wisconsin and Illinois sell gasoline. Prior to 1996, these stores sold gas under different brand names, including CITGO, distributed by Francois, "76", distributed by Uno–Ven, and Mobil. During the Fall of 1995, Stop–N–Go began negotiating with Francois about converting all or most of its stations to the CITGO brand, and by February, 1996, the parties agreed that Francois would supply CITGO to nineteen of Stop–N–Go's stations for five years.

Soon after, Uno–Ven representatives asked Stop–N–Go to consider converting all of its stations to the "76" brand. During these discussions, W.A. DeVore, a marketing executive for Uno–Ven, indicated that the company was planning to aggressively promote the "76" brand in Stop–N–Go's market. He also offered to make advance incentive payments in lieu of future rebates if the retailer converted all its stations to the "76" brand. The incentive package totaled nearly $1 million, and according to DeVore, was the largest incentive Uno–Ven had ever paid to a retailer. Finally, when asked about Stop–N–Go's potential liability were it to breach the Francois contract, a Uno–Ven representative allegedly responded that she had never seen a distributor sue for lost profits before.

On May 6, 1996, Stop–N–Go and Uno–Ven signed a Marketer Sales Agreement ("MSA") requiring the retailer to convert all of its gas stations to the "76" brand and making Uno–Ven their exclusive supplier. Accordingly, on June 7, 1996, Stop–N–Go notified Francois that it was terminating the earlier supply agreement.

### Uno–Ven

Understanding what transpired next requires some knowledge of Uno–Ven's structure and operations. It was formed in 1989 as a partnership between two major oil companies: the Unocal Corporation of California ("Unocal"), a large publicly traded corporation and owner of the "76" trademark, and Petroleos de Venezuala, S.A. ("PDV"), a company owned by the government of Venezuela.[1] Uno–Ven was overseen by a six-member Executive Committee (three from each partner), and run day-to-day by full-time partnership employees. All major decisions had to be approved by an unanimous Executive Committee. The partnership agreement allowed either partner to sell its share if the other approved. However, in the event of "substantial disagreement", Unocal, but not PDV, had the right to sell its

---

1. The partnership is actually between subsidiaries of Unocal (Midwest 76, Inc.) and PDV (VPHI Midwest, Inc.), but for ease of discussion, we refer to each partner by its parent name.

interest to a third party (subject to PDV's right of last refusal). This disparity is explained by the fact that if PDV ever left Uno–Ven, it would trigger the termination of the partnership's key asset—the long term crude oil supply agreement ("CSA").

The CSA required a PDV subsidiary to supply crude oil for twenty years to Uno–Ven for refining at its Lemont, Illinois facility. PDV's subsidiary then paid Uno–Ven a fixed rate which was meant to reflect the value of the refining process. However, due to unexpected changes in the U.S. refining industry, the fixed rate was significantly higher than the market price for refining services. As a result, the CSA acted as a subsidy to Uno–Ven and primarily benefitted Unocal. According to Unocal, the value of the subsidy could have been as high as $1 billion over the life of the CSA.

Not surprisingly, the CSA was a source of friction between the partners. PDV repeatedly tried to get Uno–Ven to either re-negotiate the agreement, or, in an effort to mitigate its unfavorable terms, re-tool the Lemont facility so that it could accept heavier Venezuelan crude oil. Unocal refused to vote for these proposals. Similarly, when Uno–Cal attempted to increase the cash disbursements from the partnership, PDV blocked the efforts.

Although the CSA subsidy guaranteed that Uno–Ven showed a profit, the Executive Committee feared that it made the partnership's management complacent. Compensation was tied to profitability which meant the day-to-day management had little incentive to make Uno–Ven an efficient operation so long as the CSA insured artificially high profits. In January 1996, the partnership hired a new President, David Tippeconnic, and a new Vice–President of Marketing, W.A. DeVore, and charged them with adding value to Uno–Ven independent of the CSA. Part of their mission was to increase sales by aggressively marketing the "76" brand in the Midwest, and recruiting as many stations (like Stop–N–Go's) as possible.

*Sale of Uno–Ven Partnership Interest*

The disagreements between Unocal and PDV over the CSA led to sporadic attempts to sell one or both of the partners' interests in Uno–Ven. Starting in 1992, an oil company owned by the government of Kuwait inquired about purchasing the entire partnership, but discussions quickly ended. In early 1995, CITGO sought unsuccessfully to purchase Unocal's interest. Later that year, the partnership negotiated with Amoco Oil Company ("Amoco") for the sale of all the partnership assets. Unocal, however, insisted that it would not sell for less than $1 billion, a figure which included its share of the partnership plus certain related assets it owned in the Midwest. Amoco balked at the price and negotiations ceased. Also in 1995, PDV's Eduardo Blanco began discussing the purchase of Unocal's interest in Uno–Ven. But Unocal continued to insist that its share of the partnership would only be sold in conjunction with its other Midwest assets for $1 billion. Because PDV believed Unocal's interest in Uno–Ven was only worth $200 million, no agreement was reached.

However, two events occurred in 1996 which made an agreement between Unocal and PDV for the sale of the partnership assets more likely. First, the Venezuelan government announced that it would be opening some of its oil fields to outside exploration. Because Unocal was a major oil exploration company, and PDV, as a state entity, would effectively be deciding who could participate, Unocal had an incentive to remain on good terms with its partner. Specifically, it did not want to create the impression that it was taking advantage of the CSA subsidy. In October 1996, Unocal indicated for the first time that it would be willing to consider selling its partnership interest apart from the other assets. However, at that point, its asking price of $350 million was still substantially higher than the $200 million offered by PDV.

The second event occurred a month later when Unocal announced an agreement to sell its Pacific Coast refining and marketing operations to the Tosco Oil Company ("Tosco"). Once completed, the sale would transfer the "76" brand to Tosco and leave Unocal with no refining and marketing operations in the United States except for its share of Uno–Ven. Upon learning this, Blanco believed that Unocal might decide to cease domestic refining and marketing entirely, and saw it as an opportunity to at last engage in meaningful negotiations over the sale of Unocal's interest in Uno–Ven.

Indeed, on November 26, 1996, just prior to the Executive Committee's regular meeting, Blanco met with representatives of Unocal and learned that it was prepared to lower its price. By the end of the day, the partners had drawn up a non-binding "Points of Understanding" memorandum which specified a price of $250 million for Unocal's interest in Uno–Ven. It also indicated that the "76" brand would be returned to Unocal, the trademark licensing agreement canceled and Uno–Ven's existing supply agreements (including the MSA agreement with Stop–N–Go) terminated. By December 26, 1996, the Board of Directors of Unocal authorized negotiations for a final agreement and the Uno–Ven partners signed a formal Letter of Intent. The transaction closed on May 1, 1997.

On April 30, 1997, Uno–Ven notified Stop–N–Go that the MSA would be terminated effective May 1, 1998. By late 1997, Stop–N–Go had entered into a new supply agreement with Amoco and British Petroleum, but retained the $1 million incentive bonus from Uno–Ven.

### Proceedings Below

Meanwhile, Francois sued Stop–N–Go for breaching its original supply agreement. Stop–N–Go then filed third party claims against Uno–Ven for, among other things, indemnification, fraud and tortious interference with the Francois contract.[2] After Francois and Stop–N–Go settled, Uno–Ven removed the claims against it to federal district court based on diversity jurisdiction. There, Judge Shabaz dismissed all but the fraud and tortious interference claims.[3]

Stop–N–Go's fraud theory was that Uno–Ven had falsely promised to market the "76" brand aggressively while at the same time it knew it was about to lose the rights to the brand through the sale of Unocal's interest. The tortious interference claim relied on Section 766A of the Restatement (Second) of Torts, and asserted that Uno–Ven, by improperly soliciting and entering into a contract with Stop–N–Go, had prevented Stop–N–Go from performing its contract with Francois. On September 14, 1998, the court granted Uno–Ven's motion for summary judgment holding that under Wisconsin law Stop–N–Go could not sustain its fraud claim because the plaintiff had failed to show that Uno–Ven misrepresented its intentions. Also, because none of Uno–Ven's conduct was fraudulent, it was absolved of liability on the claim of tortious interference with the Francois contract under Section 766A. A month later, the court re-affirmed its conclusions in a memorandum opinion denying StopN–Go's motion to reconsider.

### Discussion

We review the grant of summary judgment de novo to determine whether there exists a "genuine issue as to any material fact, and [that] ... the moving party is entitled to judgment as a matter of law."

---

**2.** Stop–N–Go did not challenge Uno–Ven's right to terminate the MSA, which is governed by the Petroleum Marketing Practices Act ("PMPA"). *See* 15 U.S.C. § 2802(b)(2)(E)(i).

**3.** Stop–N–Go had originally claimed that Uno–Ven promised to indemnify it if Francois

sued. The court found, however, that because the MSA made no mention of indemnification, and contained a merger clause, the claim was without merit. Stop–N–Go does not challenge that decision on appeal.

FED.R.CIV.P. 56(c); *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1122 (7th Cir.1994). If no reasonable juror could find for the non-moving party, the motion must be granted. *See Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 883 (7th Cir.1998). We view the evidence in a light most favorable to the non-movant, but that party may not "rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; [it] must go beyond the pleadings and support [its] contentions with proper documentary evidence." *Chemsource Inc. v. Hub Group, Inc.*, 106 F.3d 1358, 1361 (7th Cir.1997). With this standard in mind we review each of Stop–N–Go's challenges.

### Fraud in the Inducement

Stop–N–Go's fraud claim is based primarily on Uno–Ven's statements that the distributor would aggressively market the "76" brand in the Midwest. Because Uno–Ven allegedly knew that the sale of Unocal's interest in the partnership was imminent, and that Uno–Ven would lose its rights to market the brand, the statements were false. These misrepresentations,

claims Stop–N–Go, induced it to sign the MSA and incur liability to Francois.

As the district court explained, Wisconsin law[4] has long held that representations regarding one's future conduct are only considered false if "the person who made the promise had no intention to perform the same at the time he made it." *Anderson v. Tri–State Home Improvement Co.*, 268 Wis. 455, 67 N.W.2d 853, 858 (1955); *accord FDIC v. Lauterbach*, 626 F.2d 1327, 1334 (7th Cir.1980) (citing *Hartwig v. Bitter*, 29 Wis.2d 653, 139 N.W.2d 644, 646 (1966)).[5] The court therefore framed the fraud issue as whether a jury could reasonably conclude that as of March 1996, when Uno–Ven convinced Stop–N–Go to sign the MSA, it had no intention of aggressively marketing the "76" brand in the Midwest. More specifically, the court asked whether the evidence could support a finding that Uno–Ven had decided to exit the market at or before the time it made the challenged representations.

Following the reasoning of *Anderson v. Chevron*, 933 F.Supp. 52 (D.D.C.1996),[6] the

---

4. We apply Wisconsin's substantive law in this diversity suit. *Doe v. Roe No. 1*, 52 F.3d 151, 154 (7th Cir.1995).

5. Another exception to the rule about future statements is that predictions or opinion about the future made with knowledge of facts incompatible with those statements are actionable. *See Lundin v. Shimanski*, 124 Wis.2d 175, 368 N.W.2d 676, 685 (1985). Stop–N–Go briefly argues that Uno–Ven's statements were actually predictions, thus triggering this more favorable standard. However, throughout its briefs and at oral argument Stop–N–Go refers to these statements as promises and we believe that they were in fact statements of future intent.

Stop–N–Go also argues that the standard described above for assessing statements of future intent is incorrect, and maintains that the court should have asked, "Were the statements ultimately true, and under what circumstances did Uno–Ven make them?" Although Stop–N–Go mentions *Lundin v. Shimanski*, 124 Wis.2d 175, 368 N.W.2d 676 (1985) in connection with this standard, we read nothing in that case, nor any other Wisconsin authority, which supports this propo-

sition. We therefore see no error in the standard applied by the district court.

6. The facts in *Anderson* are very similar to those in the present case. 933 F.Supp. at 55–56. In the wake of Chevron's decision to exit the Mid–Atlantic market through an asset swap with Exxon, a number of gas station operators who had entered leases or supply agreements with Chevron sued claiming, among other things, fraud arising from Chevron's promise to remain in the area. The plaintiffs' theory was that although Chevron swapped assets with Exxon after the plaintiffs' agreements had been executed, Chevron had, in accordance with its long-term marketing strategy, been actively attempting to get out the Mid–Atlantic market for years. *Id.* at 56–57. Its assurances of continued presence, the plaintiff's claim, were therefore fraudulent. *Id.* at 61. The court rejected the plaintiffs' fraud claim for lack of evidence, holding that Chevron's previous unsuccessful attempts to exit the market did not amount to evidence of a decision to do so. Therefore, as of the date Chevron made the promises at issue, the evidence did not suggest that it had no intention of fulfilling them. *Id.*

court held that Stop–N–Go had failed to produce sufficient evidence supporting this conclusion. Judge Shabaz therefore held that Uno–Ven's statements were not fraudulent.

▪ Stop–N–Go challenges the court's decision by arguing that intent is inherently a jury question and was improperly disposed of on summary judgment. Essentially, it claims that the problems within Uno–Ven springing from the CSA meant that sale of Unocal's share (and the resulting loss of the "76" brand) was not only inevitable, but imminent in early 1996. This was clear from the fact that the partners had talked about, and even attempted, selling either Unocal's or both partners' shares in Uno–Ven for years. From this a jury could have concluded that Uno–Ven had no present intent to aggressively market the "76" brand.

In making this argument, Stop–N–Go relies heavily on *Golden v. Mobil Oil Corporation*, 882 F.2d 490 (11th Cir.1989). In that case Mobil was found liable for having induced Golden, a Florida gas station operator, into entering a lease and then terminating it so Mobil could sell the station. Mobil promised Golden that he had a "tremendous future" with the company, and that their relationship would be "like a marriage that was just going to get stronger." *Id.* at 491. The jury found Mobil liable for misrepresentation, and the court upheld the verdict stating that the evidence suggested a "strong probability" that Mobil had no intention of making the lease relationship long-term when it made the challenged statements. *Id.* at 495. From this, Stop–N–Go concludes that a jury should have been allowed to determine whether such a possibility existed concerning Uno–Ven's statements.

However, Stop–N–Go's claim is distinguishable from that in *Golden* for the same reason it fails: the plaintiff has not provided evidence on which a jury could reasonably find that the defendant had no intention of fulfilling its promise. In *Golden*, the plaintiff produced internal documents from Mobil showing that, prior to entering the lease, the company had already slated Golden's station for sale. *Id.* at 495. This directly contradicted Mobil's promise that the relationship with Golden would be long term, and could have formed the basis for the jury's verdict. *Id.*

▪ In this case, Stop–N–Go's evidence boils down to the fact that there were reasons for Unocal to sell its interest in Uno–Ven prior to the signing of the MSA, and that attempts to do so had been made in 1992 and 1995. Yet this would be insufficient to support a finding that Uno–Ven did not intend to aggressively market the "76" brand in the Midwest in early 1996. While the court must accept any reasonable inference on summary judgment, it need not accord weight to pure speculation. *See Chmiel v. JC Penney Life Insurance*, 158 F.3d 966, 968 (7th Cir.1998). Knowledge of past preliminary and unsuccessful discussions concerning the possible sale of the partnership assets is not incompatible with an intent to aggressively market in the future. As the district court explained, Eduardo Blanco, PDV's negotiating representative and a member of Uno–Ven's Executive Committee, testified that Unocal's demand for $1 billion—the last offer prior to Uno–Ven's approach to Stop–N–Go—was "impossible to meet." His un-rebutted testimony is that Uno–Ven was therefore conducting "business as usual" as of March 1996. Part of that business, as evidenced by the hiring of Tippeconnic and DeVore, was the aggressive expansion of Uno–Ven's marketing efforts.[7] As for the CSA, the court noted

---

7. That intention obviously changed in late 1996, with the opening of the Venezuelan oil fields and the sale of Unocal's other U.S. marketing operations to Tosco. At that point, Unocal backed off its all or nothing approach (and its $1 billion price) to selling its shares in Uno–Ven, and a deal with PDV then became possible. Yet these events occurred after Stop–N–Go signed the MSA and are not evidence of Uno–Ven's intent when it made the representations in early 1996.

that the partners had been operating successfully (if not happily) under this system for over six years. This belies the notion that as of early 1996 Unocal, the primary beneficiary of the CSA subsidy, would soon sell its interest.

Stop–N–Go makes much of the unprecedented $1 million incentive paid by Uno-Ven, arguing that it was part of the defendant's elaborate ruse to convince Stop–N–Go of its false commitment to the "76" brand. Yet, if anything, the up-front incentive payment is strong evidence that Uno–Ven had every intention of aggressively marketing its brand when it convinced Stop–N–Go to sign the MSA. Stop–N–Go's problem in advancing its argument is that it has failed even to allege, let alone support with evidence, any plausible explanation for why Uno–Ven would offer such a large incentive (or hotly pursue Stop–N–Go for that matter) if the sale of Unocal's interest—and the loss of the "76" brand that went with it—was imminent. Based on the evidence presented, a reasonable jury could not conclude that the payment was meant merely to throw Stop–N–Go off its guard.

Because Stop–N–Go has produced no evidence that Uno–Ven did not intend to fulfill its promises in early 1996, it cannot sustain its fraud claim. *See FDIC v. Lauterbach*, 626 F.2d 1327, 1334 (7th Cir.1980). We therefore agree with the district court that summary judgment in favor of Uno–Ven was appropriate.

### Tortious Interference With Contract

■ Stop–N–Go's second theory is that Uno–Ven improperly interfered with the Francois contract by aggressively pursuing Stop–N–Go with false promises, financial incentives and assurances that Francois was not likely to sue.[8] This theory

relies on Stop–N–Go's interpretation of Section 766A of the Restatement (Second) of Torts, which Wisconsin courts have recently recognized. *Magnum Radio, Inc. v. Brieske*, 217 Wis.2d 130, 577 N.W.2d 377 (Ct.App.1998). That provision states:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to the other for the pecuniary loss resulting to him.

RESTATEMENT (SECOND) OF TORTS SECTION 766A.

■ After finding that Uno–Ven's statements did not amount to misrepresentation, the district court held that the defendant's conduct could not support a claim for tortious interference under Section 766A. The plaintiff now urges that Judge Shabaz improperly required it to prove the independent tort of fraud before it could establish tortious interference. *See Colorado Interstate Gas Co. v. Natural Gas Pipeline Co.*, 885 F.2d 683 (10th Cir.1989). However, the district court's memoranda prove otherwise. Judge Shabaz indicated that because the conduct forming the basis for the interference claim was essentially the same as that alleged in the fraud claim, and because the court had determined that no misrepresentations were made, the conduct was not improper and could not support the interference claim. The issue then is whether Uno–Ven's alleged conduct in connection with convincing Stop–N–Go to sign the MSA and break its agreement with Francois was improper, regardless of whether it was also fraudulent.

■ The exact parameters of the Section 766A cause of action are not well

---

**8.** The testimony supporting this statement appears to be hearsay and its admissibility is contested by Uno–Ven. Even assuming such an assurance was made, however, Stop–N–Go does not allege that it was untrue. As explained below, because this statement, as well as Uno–Ven's promises of aggressive marketing, were not misrepresentations, we do not believe they support a claim for intentional interference, and need not address the challenged statement's admissibility.

established. Much of the case law addressing this section involves claims that a defendant made a plaintiff's performance more difficult or expensive. *See Magnum Radio*, 577 N.W.2d at 379–80; *Windsor Securities v. Hartford Life Insurance Co.*, 986 F.2d 655, 659 (3rd Cir.1993). These cases are therefore not particularly helpful in determining what conduct supports a claim that a defendant improperly secured a plaintiff's breach. However, we do know that liability clearly exists where a defendant physically prevents a plaintiff from performing, *see* SECTION 766A cmt. g, or triggers the breach by fraudulent misrepresentation. *Havoco v. Sumitomo Corp.*, 971 F.2d 1332, 1344–45 (7th Cir.1992). Less clear is whether, absent force, intimidation or fraud, a plaintiff can complain of its own breach based only on the aggressive pursuit of the defendant.

Initially, it should be noted that, except for the alleged misrepresentation, none of the other conduct described by Stop–N–Go is normally considered improper (or even unusual). Stop–N–Go did not, for instance, argue that the $1 million incentive was illegal or illusory. Similarly, the plaintiff did not claim the statement allegedly made by a Uno–Ven representative concerning Francois was untrue, and it was allegedly made upon Stop–N–Go's request. Nor did Stop–N–Go claim that Uno–Ven's actions were motivated by ill will or the desire to harm either the plaintiff or Francois. *See Colorado Interstate Gas Co. v. Natural Gas Pipeline Co.*, 885 F.2d 683, 691 (10th Cir.1989). The breach was a product not of UnoVen's preventing performance, but of Stop–N–Go's free choice.

■ Aside from its fraudulent misrepresentation claim, Stop–N–Go acknowledges that it was a willing participant in entering the MSA. In fact, it admits that it thought the Uno–Ven deal, with the $1 million incentive payment up front, would have allowed it to satisfy any liability to Francois and still end up ahead. In other words, Stop–N–Go attempted an efficient breach

of the Francois contract. *See Patton v. Mid–Continent Systems*, 841 F.2d 742, 750 (7th Cir.1988). Because, at least in theory, this kind of breach makes society better off, the law does not treat it as disfavored. *See id.; Windsor Securities*, 986 F.2d at 664; *see also* E. Allen Farnsworth, *Contracts* § 12.8 at 194–95 (2nd ed. 1990) ("Most courts have not infringed on the freedom to keep or break a contract traditionally afforded a party by the common law and endorsed by the notion of efficient breach.") However, the breaching party must calculate the costs and benefits of the anticipated breach and—absent contract provisions to the contrary—generally bears the risk of something going wrong. The interpretation of Section 776A urged by Stop–N–Go would change this. By not requiring anything more than aggressive pursuit, Stop–N–Go's theory would make Uno–Ven the insurer of Stop–N–Go's anticipated breach. In other words, it would allow a plaintiff to accept the more favorable terms offered by the defendant, but then hold the defendant liable if things do not turn out as planned. While the parties—both sophisticated and experienced businesses—were free to arrange this by contract, we are reluctant to reach such a result through tort law. This is particularly true in light of the fact that the plaintiff can point to no Wisconsin case (or other authority) supporting such a result.

Nonetheless, Stop–N–Go maintains that its interpretation is compelled by language in the official comments contained in Section 766A—particularly comment g, entitled "means of interference." While this comment discusses physical restraint and intimidation as the basis for the tort, it references comments h,i,k,l and m of Section 766 as having application to Section 766A as well. Comment m of Section 766, in turn, describes "inducement by offer of better terms" as actionable. This, argues Stop–N–Go, is exactly what Uno–Ven is accused of doing and a jury should have been permitted to assess that accusation.

Uno–Ven counters by emphasizing the differences between Section 766A and Section 766.[9] The language of Section 766 speaks of the defendant "inducing" a breach. As comments h and m of Section 766 indicate, "inducing" can mean a defendant acting upon the free will of a third party in securing a breach. Thus, otherwise proper business tactics—like offering more favorable terms—may, in certain circumstances, be actionable under Section 766. *See* Section 766 cmt. m. Section 766A, on the other hand, uses the term "preventing" instead of "inducing." The significance of this word choice, argues Uno–Ven, is explained by comment b to Section 766A, which traces the development of the interference tort. That comment states that the original tort outlined by Section 766 contemplated only interference by inducement "—meaning persuading [the contracting party] by operation on his mind and thus causing him to choose to break the contract—", but eventually came to include "preventing his performance by some means other than influencing his mental choice." Section 766A cmt. b. The comment goes on to explain that the Section 766A cause of action deals with "this last development." *Id.* Thus, argues Uno–Ven, the conduct required to make out a claim under Section 766A must be more than mere persuasion (or even aggressive persuasion—so long as the plaintiff had a free "mental choice").

9. Section 766 provides:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.
> Restatement (Second) of Torts Section 766. In this case, Section 766 could only have been invoked against Uno–Ven by Francois, who is no longer a party.

10. We note that Uno–Ven's interpretation squares with this court's holding in *Havoco v. Sumitomo*, 971 F.2d 1332 (7th Cir.1992). In

This conclusion was implicitly drawn by the Third Circuit in *Windsor Securities v. Hartford Life Insurance*, 986 F.2d 655 (3rd Cir.1993). Noting the difference in the language between Sections 766 and 766A, the court stated, "when the defendant prevents plaintiff's performance [under 766A] the plaintiff will presumably not be a willing participant. Generally, such cases involve force, fraud, or other independently actionable conduct[.]" *Id.* at 662 & n. 11 (citing Harvey S. Perlman, *Interference with Contract and Other Economic Expectations: A Clash of Tort and Contract Doctrine*, 49 U.Chi.L.Rev. 61, 100 n. 167 (1982)).[10]

▮▮▮ While we agree that Stop–N–Go's argument identifies an ambiguity in the drafting of Section 766A,[11] we believe that a Wisconsin court would find Uno–Ven's reading of the provision more compelling. As noted above, we are aware of no authority for the proposition that, absent fraud, force or intimidation, otherwise lawful conduct (offering incentives and promising future support) can be the basis for an interference claim by the breaching party, and we do not believe that a Wisconsin court would interpret Section 766A in a manner that would allow it.

### Conclusion

Because Stop–N–Go has not presented evidence on which a jury could reasonably

that case, Havoco hired Hill to re-negotiate a contract it had with the TVA. *Id.* at 1342. Hill's misrepresentations, however, caused Havoco to ultimately lose the contract. We held that "Hill's fraudulent conduct made it impossible for Havoco to reach an agreement." *Id.* at 1345. When the conduct alleged is fraudulent, it cannot safely be said that a breach was the result of the breacher's free choice. It is thus clearly actionable under Section 766A.

11. The ambiguity is highlighted by the fact that comment m of Section 766 (referenced by Section 766A) is entitled "Inducement by offer of better terms." Yet the language of Section 766A itself, which speaks of "preventing" instead of "inducing," appears to be aimed only at the former.

conclude that Uno–Ven misrepresented its intent to aggressively market the "76" brand in early 1996, the plaintiff's fraud claim was appropriately denied on summary judgment. Similarly, in the absence of misrepresentation, or other improper activity, Stop–N–Go has failed to establish a viable claim for tortious interference with contract. We therefore AFFIRM the decision of the district court.