# In the Iowa Supreme Court

No. 24–1886

Submitted March 25, 2026—Filed June 12, 2026

**5th and Walnut Parking LLC, 5th and Walnut Tower LLC, 5th and Court LLC, Justin Mandelbaum,** and **Sean Mandelbaum,**

Appellees,

vs.

**City of Des Moines,**

Appellant.

---

**City of Des Moines,**

Third-Party-Plaintiff Appellant,

vs.

**John Mandelbaum,**

Third-Party-Defendant Appellee.

---

Appeal from the Iowa District Court for Polk County, Lawrence P. McLellan, Business Specialty Court Judge.

The City appeals and the developers cross-appeal from a judgment for money damages on a failed real estate project. **Appeal Affirmed in Part and Reversed in Part; Cross-Appeal Affirmed.**

Waterman, J., delivered the opinion of the court, in which all participating justices joined. McDermott, J., took no part in the consideration or decision of the case.

Thomas G. Fisher Jr. (argued), Deputy City Attorney, and John O. Haraldson, Assistant City Attorney, Des Moines, for appellant.

Todd M. Lantz (argued), Mark E. Weinhardt, William C. Admussen, and Jason R. Smith of Weinhardt & Lantz, P.C., Des Moines, for appellee.

**Waterman, Justice.**

The Tower at Fifth and Walnut in downtown Des Moines was supposed to be a testament to modern design, with upscale residential lofts, a movie theater, and ample parking, but what began as a promising urban development devolved into a costly litigation quagmire. This breach of contract case was tried to the court. The trial court's factual findings are binding upon us if supported by substantial evidence. *CMT Highway, LLC v. Logan Contractors Supply, Inc.,* __ N.W.3d ___, ___, 2026 WL 1108827, at *4 (Iowa Apr. 24, 2026). We view the evidence in a light most favorable to the trial court's judgment. *Id.* Our dispositions of the fact-bound issues in this appeal are largely dictated by this standard of review.

For the reasons explained below, we affirm the district court judgment against the City of Des Moines for breach of contract and the damages awarded for that breach in the amount of $4,353,677. We vacate its judgment against the city for tortious interference with contract. And we affirm the district court judgment rejecting the parties' additional claims for relief.

**I. Background Facts and Proceedings.**

**A. Early Stages of the Fifth and Walnut Development.** In 2009, Justin Mandelbaum, a real estate developer who had spent his career to that point working internationally and on the East Coast of the United States, moved back to his hometown of Des Moines. Justin was eager to ply his trade in the local real estate market. He joined Mandelbaum Properties, his family's real estate development firm, and began hunting for development opportunities in downtown Des Moines.

In 2013, Justin and his team began looking at property around Court Avenue. When a property became available, Justin submitted a request for

proposal (RFP), a document that outlines a development plan that a local government can use to evaluate the benefits of a given project. Justin's RFP proposed constructing a movie theater and entertainment complex. Despite interest in the RFP, the City of Des Moines (the City) rejected Justin's proposal in favor of a Hy-Vee grocery store by the Polk County Courthouse.

In 2014, Matt Anderson, the City's economic development director, approached Justin to discuss another lot near Court Avenue. Anderson told Justin to submit a developer-initiated proposal—a means of streamlining the sale of City land. Justin submitted his proposal.

In the summer of 2015, the Des Moines City Council (City Council) voted to accept for consideration Justin's proposal and to open a ninety-day competition period, during which time other developers could make a pitch for their projects. No developer submitted a counterproposal.

In December of 2015, Justin and his team submitted a pro forma for the City's consideration. The pro forma was notable for two reasons. First, part of Justin's pro forma—and a fly in the ointment throughout this litigation—was a parking garage.

Second, the pro forma contained a 5% development fee for Justin and his team's work on the project. Pursuant to the pro forma, the City would pay that fee upon completion of the parking garage. Parking garages typically are not profitable on their own. So, to make the project work, Justin needed subsidies.

To begin, the City agreed to sell Justin and his team a site for $4 million dollars, with a forgivable "economic development" loan for the same amount, meaning that Justin would acquire the land for zero net cash outlay. The City also offered tax incentives, bond financing, and shortfall loans to facilitate the project.

In early 2017, after months of negotiations, Justin and the City reached a final development agreement (Development Agreement) for the project. The project was to consist of three elements: a parking garage with space for restaurants and retail stores, which was to be completed by August of 2020; a forty-story tower with a high-end hotel and residential lofts (the Tower), and a theater complex with an upscale dine-in movie theater and additional retail space (the Theater)—both of which were to be completed by August of 2028. By finishing the parking garage first, Justin and his team would provide parking spaces for the City and revenue to pay off their forgivable loan.

Article 8, Section 8.2(E) of the Development Agreement provided:

> E. Developer agrees that if the costs of constructing the Parking Garage exceed the Stipulated Price due to no fault of the City, then Developer shall be responsible for the increase in costs associated with completing construction of the Parking Garage. City acknowledges that City is not entitled to participate in any savings realized by Developer in the acquisition, construction or development of the Parking Garage or Parking Parcel, and that any savings or benefits realized shall accrue 100% to Developer.

This meant that if Justin and his team completed the garage under budget, then they were entitled to keep the amount saved.

Under Article 10 of the Development Agreement, both the City and Justin and his team had certain rights. Most importantly for this litigation, Sections 10.1 and 10.4 of the Development Agreement provided the terms governing a default by either party.

Section 10.1 stated:

> A. Except as otherwise specifically provided in this Agreement, in the event of a default by either party under this Agreement, the aggrieved party may by written Notice of Default to the party in default, demand that it proceed immediately to cure or remedy such default, and, in any event, complete such cure or remedy within forty-five (45) days (or such other time as may be specifically provided herein) after receipt of such notice. Any default on an

obligation to pay money shall be cured within five (5) business days after receipt of such notice. Notwithstanding the foregoing, if any non-monetary default reasonably requires more than forty-five (45) days to cure, such default shall not constitute a breach of this Agreement if the defaulting party commences to cure the default promptly upon receipt of the notice of the default and with due diligence thereafter continuously prosecutes such cure to completion.

B. In the event that a Notice of Default is given as provided above and action to cure or remedy the default is not promptly taken or not diligently pursued, or the default is not cured or remedied within the time allowed, then the party in default may be declared to be in breach of this Agreement by the aggrieved party. In the event of a breach of this Agreement, in addition to such other rights as the aggrieved party may have hereunder, the aggrieved party may institute proceedings for damages for breach of contract. In any claim, action or civil proceeding wherein damages are sought for breach of this Agreement, City shall have the same rights and liabilities as a private non-governmental party for any breach of this Agreement.

Section 10.4, which governed unforeseen, enforced delays in the project (called *force majeure* or acts of God), provided:

Except for an obligation to pay money to the other pursuant to this Agreement, neither City nor Developer shall be considered in breach of, or in default of, its obligations with respect to this Agreement, or any portion thereof, including redevelopment, or the beginning and completion of construction of the Improvements, in the event of an enforced delay in the performance of such obligations due to unforeseeable causes beyond its control and without its fault or negligence, including, but not restricted to, temporary injunctions, acts of God, acts of the public enemy, war, or terrorism, acts of government (provided City may not rely upon its own acts as reason for delay), acts of the other party, fires, floods, epidemics, quarantine restrictions, strikes or other labor disruptions, freight embargoes, economic or financial market collapse causing a national loss of available financing upon commercially reasonable terms, and unusually severe weather or delays of subcontractors due to such causes; it being the purpose and intent of this provision that in the event of the occurrence of any such enforced delay, the time or times for performance of the obligations of City or of Developer, as the case may be, shall be extended for the period of the enforced delay: Provided, that the party seeking the benefit of the provisions of this

article shall: i) within twenty (20) days after the beginning of any such enforced delay, have notified the other party thereof, in writing, and of the cause or causes thereof, and setting forth the anticipated extension required as a result of the enforced delay; and, ii) exercise reasonable diligence to mitigate the event and the impact thereof.

While the parties later amended other sections of the Development Agreement, Sections 10.1 and 10.4 remained unchanged.

Also in 2017, Justin formed three limited liability companies to manage the various aspects of the development. For the parking garage, he formed 5th and Walnut Parking LLC (Parking LLC). For the Tower, he formed 5th and Walnut Tower LLC (Tower LLC). And, for the Theater, he formed 5th and Court LLC (Court LLC). These entities, together with Justin and his brother Sean, will be referred to collectively throughout this opinion as "the Developers."

Once they finalized the terms of the Development Agreement, the Developers were to submit their documents for City Council approval. Before the council could adopt the proposal, Iowa law required a second bidding period during which other developers could submit competing proposals.

In March, Blackbird Investments—another development firm—submitted an alternative development proposal. Blackbird's proposal included a larger parking garage, low-income housing units, and a hotel. Its construction timeline was also condensed compared with the Developers'.

The City remained interested in the Developers' proposal, but Scott Sanders, the City manager, asked the Developers to accelerate their project timeline. Specifically, Sanders requested that the Developers complete the parking garage by October 31, 2019, and that they begin construction on the Tower on that same day. Justin reluctantly agreed to those dates, though he warned the City that by accelerating the pace of construction, it was removing

much of the cushion for delays. Ultimately Blackbird withdrew its proposal, and the City approved the Development Agreement.

**B. The Project Begins.** Initially, the Developers financed the project with money borrowed from Lincoln Savings Bank. The Mandelbaums personally guaranteed loans amounting to about $5 million dollars. But they paid off the Lincoln Savings' loans when, after seeking a construction loan for the parking garage, they borrowed money from Bankers Trust (the Bank). The Developers would continue working with the Bank for the remainder of the project.

Almost immediately after the City and the Developers signed the Development Agreement, they began negotiations to amend it. The amendment was necessary because of issues related to the City's skywalk system. The Developers were also eager for an amendment because a hitch in the chain of title for a six-and-a-half-foot alleyway abutting the development site prevented them from beginning work. To resolve this problem, the Developers asked the City to convey the alley to them. Meanwhile, the Developers' architects were unable to proceed with the project designs until the alley issue was resolved. This delay lasted three and a half months, until the City approved an amendment in July of 2017. Despite the delay, the Developers did not request an extension of deadlines.

After the City finally resolved the alley issue, the Developers submitted conceptual design plans for the entire project. These plans included several major updates: they increased the number of parking spaces to be included in the garage, they increased the number of rooms to be included in the hotel, and they incorporated an aluminum screen façade to encompass the parking garage. These updates necessitated a second amendment to the Development Agreement. That amendment, which the City Council approved in December

2017, extended the completion deadline for the parking garage to February 2020; however, the deadline to begin construction on the Tower or Theater (October 31, 2019) remained unchanged.

In April 2018, the Developers and the City again discussed increasing the garage's parking capacity. This time, they agreed to add another sixty parking spaces. The Bank wanted this update in writing. But when the Developers began pressing for the third amendment, the City grew reticent. At root, the City was unwilling to pay the Developers for additional parking spaces, despite previously agreeing to a per-space price formula.

Months dragged on, and the parties could not reach an agreement about the additional parking spaces. Finally, in September, the City Council and the Developers agreed to a third amendment that incorporated the new parking spaces. For the entirety of the April to September delay, the Developers' architects were unable to work on the development. While the Developers and the City were discussing the third amendment, the deadline to commence construction on the parking garage arrived. To avoid a default, the Developers negotiated with Sanders to get an informal extension of deadlines. Under this agreement, the Developers would reach a so-called "secondary closing"[1] by August 10, 2018, and would begin construction of the garage by August 24, 2018. The Developers met neither of these deadlines. The City did not issue a notice of default for either of the missed deadlines. Ultimately, the third amended Development Agreement formally extended the deadlines for the parking garage; it left unchanged the October 31, 2019 deadline to begin construction on the Tower or Theater.

---

[1]As used in this opinion, the "preliminary closing" occurred when the Developers purchased the land from the City, and the "secondary closing" occurred when the Developers fulfilled certain conditions that permitted them to begin construction of the project.

Shortly after the parties agreed on the terms of the third amended development agreement, the Developers began construction on the parking garage.

**C. More Delays.** By May 2019, it became increasingly clear that the Developers: (1) could not begin construction of the Theater on October 31, 2019, and (2) that it would be difficult for them to begin construction of the Tower by that date. The Developers communicated these facts to the City. The City initially was receptive to an amendment that would extend the construction deadlines. To that end, the Developers drafted a proposed extension of six months for the Tower and twelve months for the Theater.

In August, The City responded to the Developers' draft with its own proposed amendment. In September, the parties bandied additional drafts back and forth. But, because of political pressures, the City did not want to put an amended development agreement to a vote during the month of October, meaning that a formalized extension was delayed until November at the earliest.

In the interim, Sanders sent the Developers a letter in which he claimed that Justin had admitted that the Developers would not be able to complete the façade of the parking garage by the August 16, 2020 deadline. Justin disputed this assertion. Sanders's letter went on to say:

> To allow for continued discussions on the text of the proposed amendment, I agree that in the exercise of the authority delegated to me by the City Council to administer the Agreement, I will refrain from issuing any notice of default for the failure to timely satisfy the obligations listed above before December 18, 2019.

The Developers understood this letter to mean that the City was extending their deadlines.

At their meeting in November, the Developers told the City that SCB (the architectural firm that the Developers had hired) was wrongfully withholding

documents from the Developers. This, and other delays, led the Developers to request a yearlong extension on the deadline to construct the Tower. The City's representatives were receptive to this proposal.

A few weeks after the meeting, Carrie Kruse, an economic development coordinator working for the City, contacted the Developers and told them that they would have to present some of the revisions to their project to the Urban Design Review Board (UDRB). Justin presented the revisions, and, in December, the UDRB approved the new plans, with some comments from board members.

Also in December, the Developers applied for a building permit for the Tower and Theater. They needed to apply for the permit during 2019 because the City was adopting a new building code in 2020, and the parties wanted to grandfather in the project under the old code.

Still awaiting an amendment to the Development Agreement, the Developers met with City representatives on December 5. Sanders told the Developers that there was no political will to amend the Development Agreement unless the City received something in return. Sanders proposed that the Developers place $5 million dollars in an escrow account, which would serve as an incentive for the Developers to advance the project in a timely manner. Justin described this proposal as a shakedown. The meeting ended with the parties at loggerheads.

On December 18, Sanders wrote a letter to Justin and to the Bank's representatives. That letter made several points: (1) Sanders was frustrated that Justin was seeking an amendment to the Development Agreement, (2) Justin admitted that he needed a year's delay to meet the City's requirements, (3) Justin had told the City that he could not complete the west façade of the parking garage by the deadline in the Development Agreement, (4) the Developers were insisting

on design changes that were unacceptable to the City, and (5) the Developers' insistence on new terms had stymied any progress on an amendment to the Development Agreement. Justin disputed each of these points. Importantly, Sanders's letter stated: "This letter IS NOT a Notice of Default pursuant to Article 10 of the Agreement. This is instead a request to resolve and remedy the existing deficiencies under the Agreement by a negotiated settlement and amendment to the Agreement." His letter then listed various problems with the Developers' proposed revisions to their project plans. According to the letter, the UDRB had identified these problems at the initial hearing, and, upon consideration, the City had rejected the proposed design revisions. Finally, Sanders wrote:

> If the Developers will formally request a continued deferral by the City of further enforcement action to allow negotiations to proceed on an amendment to the existing Agreement consistent with the terms outlined above, I will submit and support that request to the City Council at its next meeting on January 13, 2020. Such a request would be interpreted as demonstrating the Developers' confidence that the Residential Building will be completed on the delayed schedule. The absence of such a request will be interpreted as evidence that the Developers have lost confidence in their ability to timely perform under even a delayed schedule. In that event, the City may immediately give formal notice of the existing defaults and seek to enforce its legal remedies under the Agreement. If the Developers will formally request a continued deferral as identified above, the parties can immediately proceed with negotiations on an amendment consistent with the terms identified above. The Developers will also need to promptly seek an amendment to the approved Conceptual Development Plan to accommodate the current design of the Residential Building and South Building.

Meanwhile, the Developers paid their architects, SCB, about $800,000 to release the design specifications that SCB had been withholding. This move freed up the designs for review by the Developers and eventual submission as part of the permitting process.

In January 2020, Sanders asked Justin to draft a letter that Sanders could send to the City Council. Justin began working on a draft. Sanders requested that Justin send him a working draft before sending the formal letter. Justin obliged.

In this draft, Justin explained the delays in construction and reassured the City that the Developers were committed to completing the project. Justin requested that the City extend the deadline for completion of the parking garage to November 30, 2020.

After receiving the draft letter, Sanders sent two return drafts to Justin. Sanders did not tell Justin that he had edited the document, but there were numerous changes between the drafts and the original. The second draft (sent January 16, 2020) included such changes as: (1) a statement that the Developers would agree to escrow $4 million until the Tower was constructed; and (2) an additional term that, if the Developers failed to execute a construction contract and financing agreement for the Tower by January 15, 2021, then the parking garage would pass into a receivership until the Developers began construction of the Tower or until April 30, 2022, whichever came first. If April 30, 2022, came and went without construction of the Tower and the Developers did not timely remedy the default, then the City would have the option to recover ownership of the entire project and the escrowed funds.

The Developers found the modified letter unacceptable. Justin called Sanders and told him that they could not endorse the new draft. Sanders told Justin to hold off on sending the original letter so that they could continue discussions.

On February 6, Sanders sent Justin a draft letter that he, Sanders, intended to send at the end of that week. The letter stated in part:

> By letter of October 14, 2019 and December 18, 2019, I expressed my frustration that Justin Mandelbaum was seeking amendments to the Amended and Restated Urban Renewal Agreement for Sale of Land for Private Redevelopment that I could not support. No amendment has been negotiated, and the Developers continue to insist on new terms and design changes that are not acceptable to the City.
>
> This letter IS NOT a Notice of Default pursuant to Article 10 of the Agreement. This is instead a notice that the City will draft an amendment to the Development Agreement for City Council that is intended to operate as a negotiated settlement agreement to resolve and remedy the Developers' ongoing noncompliance with their obligations under the Agreement.

The letter went on to state that the City would agree to an amendment to the Development Agreement, including an extension of deadlines, so long as the Developers agreed to escrow $4 million dollars and adopt the above-mentioned receivership scheme, among other changes. The letter concluded with the following paragraph:

> I expect an amendment to the Development Agreement be presented for council consideration on or before the March 23, 2020 City Council Meeting. In the event the City and Developer cannot agree on an Amendment to the Development Agreement, the City may immediately give formal notice of the existing defaults and seek to enforce its legal remedies under the Agreement. As mentioned in prior communications, the Developers will also need to promptly seek an amendment to the approved Conceptual Development Plan to accommodate the current design of the Residential Building and South Building.

No amendment to the Development Agreement was presented to the City Council in March 2020. Nor did the City give the Developers a Notice of Default.

**D. The Pandemic.** On March 11, 2020, the World Health Organization declared that the spread of the COVID-19 virus had reached pandemic levels. Two days later, the President of the United States declared a state of emergency.

Two days after that, the mayor of Des Moines declared a city-wide state of emergency. On March 17, the Governor of Iowa issued a proclamation declaring a statewide emergency and mandating the closure of many businesses. On March 18, Justin sent a letter to Sanders. The letter invoked the Developers' rights under Section 10.4 of the Development Agreement, stating: "Below is an email Nate sent to Roger providing notice of an enforced delay. We are required per the Development Agreement to provide this notice within 20 days of the onset of the enforced delay."

Just under a week later, Sanders responded to Justin's letter. Near the top of Sanders's response, he wrote:

> As with the prior letters, this letter IS NOT a Notice of Default pursuant to Article 10 of the Agreement. However, pursuant to Section 10.6 of the Agreement, the City's delay in giving notice of default is not a waiver of that right, and the City reserves the right to give such notice at any time.

The letter continued, explaining that financial markets "have certainly not collapsed," and pointing out that the Developers had not identified specific impediments resulting from the COVID-19 pandemic.

In response, the Developers wrote a follow-up letter providing Sanders with additional evidence elaborating on the dire nature of the pandemic and the specific negative consequences that it would have on the development. Sanders never responded to this letter.

In April, the City sent the Developers the draft of the amended Development Agreement that they had discussed back in February. The draft amendment contained numerous additional conditions even beyond the escrow and receivership terms that Sanders had previously floated. Justin called Sanders to express his displeasure at the proposed amendment. Sanders asked Justin to put his complaints into writing. Justin did so.

On May 27, in response to Justin's objections to the proposed amendment, Sanders wrote another letter. In this letter, Sanders took umbrage at what he perceived to be the Developers' delay in reviewing the proposed amendment, and he proposed additional changes to the development agreement. Near the bottom of the letter, Sanders stated:

> The City will issue a Notice of Default for all presently existing defaults under the existing agreement unless each of the following occur:
>
> • On or by June 5, 2020, the developer and Bankers Trust must agree to terms of the Second Substituted Agreement that are acceptable to the City.
>
> • On or by June 12, 2020, the Developer and Bankers Trust must have executed the Second Substituted Agreement.
>
> • On or by June 22, 2020, the Des Moines City Council must have approved the Second Substituted Agreement.

On June 5, Justin carbon copied the City Council and responded to Sanders. Justin argued that the Developers had complied with the Development Agreement at least as to the parking garage. He argued that the Developers had been diligently pursuing the project and that, because of the enforced delay resulting from COVID-19, they were entitled to more time. And he argued that, in the event of a default, the Development Agreement afforded the Developers a right to cure.

On June 9, Justin met with Sanders and Kruse. During that meeting, Justin explained that the pandemic had collapsed traditional financing markets, and, therefore, the Developers' original financing plan was no longer viable. According to Sanders, it was at this meeting that he lost confidence in the Developers' ability to finance the remainder of the project.

On June 24, the City issued its first notices of default to the Developers. The notices identified the act of default as the Developers' failure to begin

construction on the Tower or Theater by the October 31, 2019 deadline. The default notices contained an election of remedies that stated:

> The City of Des Moines hereby elects to acquire the Property and all Improvements, as provided in the Development Agreement pursuant to section 10.2(C) as an alternate remedy to the remedies allowed by sections 10(D) and (E) of the Development Agreement, without waiving any of its other available remedies. The City hereby notifies [Parking LLC, Court LLC, and Tower LLC] that each are obligated to convey Property as defined in the Development Agreement to the City in accordance with their respective obligations under section 10.2(C)(2) as agreed to or assumed.

On June 30, the Developers' attorneys sent a letter to the City demanding rescission of the default notices. They received no response.

The City's decision to issue default notices jeopardized the remainder of the development because the Bank, in funding the project, relied on the City's involvement to mitigate risk. Essentially, the Bank had trusted the City to cover any debt service payments as they came due. When the City began to doubt the Developers' ability to bring the project to completion, the Bank feared for its investment. This problem grew more acute as August 31—the maturity date of the Developers' first construction loan—approached.

When the Developers first realized, in spring 2020, that they would not be able to complete the parking garage by August 31, they informed the Bank and began discussing an extension. But although their past discussions indicated that the Bank would be willing to grant the Developers an extension, the tenor of the conversations changed as the likelihood that the City would issue default notices increased. The Bank warned the Developers that it would not grant an extension unless they were in compliance with the Development Agreement.

On August 6, Justin wrote a letter to City Attorney Thomas Fisher. In that letter, he asked the City to rescind the default notices, and he explained that if the City pursued default remedies, then the Developers' construction loan with

the Bank would come due and the Bank would commence foreclosure proceedings. The City refused. On August 31, 2020, the Developers' construction loan matured. Neither the City nor Bankers Trust extended the Developers' deadlines.

**E. The Litigation.** On September 14, 2020, the Bank filed a petition to foreclose its mortgage and a motion to appoint a receiver to take over the parking garage project from Parking LLC.

Just over a week later, the Developers filed a cross-petition against the City. The cross-petition brought claims for: (1) breach of contract on behalf of all cross-claimants, (2) tortious interference with an existing contract with the Bank on behalf of Parking LLC and the Mandelbaums, (3) indemnity on behalf of Parking LLC and the Mandelbaums, (4) declaratory relief on behalf of all cross-claimants, (5) interference with existing and prospective economic advantage on behalf of all cross-claimants, (6) injunctive relief against the default notices on behalf of all cross-claimants, and (7) injunctive relief against the conveyance from Bankers Trust to the City.

On October 1, the district court appointed Christensen Development as receiver for the parking garage. On January 25, 2021, the district court authorized Christensen to sell the garage. The City purchased the property, extinguishing the Developers' debt to the Bank. This prevented the Developers from completing the garage, earning the development fee, and collecting the savings off the stipulated cost of construction.

On January 26, the City answered the Developers' pleading and counterclaimed for: (1) fraud in the inducement against Justin Mandelbaum, (2) breach of contract (failure to perform) against all counterclaim defendants, (3) breach of contract (default and failure to repay loan) against all counterclaim

defendants, (4) breach of contract (specific performance) against all counterclaim defendants, (5) fraudulent or negligent misrepresentation against all cross-claimants, (6) unjust enrichment against all cross-claimants, (7) breach of contract (default and failure to repay loan) against all counterclaim defendants, and (8) a third-party claim against Justin Mandelbaum personally.

On March 10, Bankers Trust, satisfied because of the repayment of its construction loan, dismissed without prejudice its petition against the Developers and the City. This dismissal meant that the only active litigation was between the Developers and the City.

On March 23, the Developers moved for partial summary judgment, asking the court to resolve the following questions: (1) "Does Section 10.4 of the Development Agreement apply to the deadline to commence construction of the Tower and the South Building?" (2) "Can Section 10.4 of the Development Agreement protect the Developer from being considered in default or breach of the Development Agreement even though the enforced delay arose after the deadlines to commence construction?" (3) "Does Section 10.1 of the Development Agreement require the City to provide an opportunity to cure a default for failure to commence construction by the deadlines stated in Section 6.2?" (4) "Is the special remedy under Section 10.2(C) of the Development Agreement available to the City before completion of the Garage and conversion to permanent financing?" (5) "Aside from whether the special remedy under Section 10.2(C) was properly elected, does that special remedy eliminate the Developer's obligations to the City under the Forgivable Loan?" (6) "Can the City sue Justin Mandelbaum for fraud based on commitments to complete buildings that were stated in the Development Agreement, as the City has alleged in Counterclaim I?" (7) "Can the City use an equitable claim of unjust

enrichment to create a property right in the Developer's documents, designs, and contracts and create a remedy requiring conveyance of that property that is contrary to the parties' express contract, as the City has alleged in Counterclaim VI?" (8) "Can Justin Mandelbaum and Sean Mandelbaum be personally liable for the Developer's general obligations under the Development Agreement . . .?" The City resisted the developers' motion for partial summary judgment.

On September 24, the district court granted in part and denied in part the Developers' motion for summary judgment. Specifically, the district court determined that: (1) the special remedy under Section 10.2(C) of the Development Agreement terminated the Developers' obligation to make any further payments to the City, and (2) a party cannot rely on the doctrine of unjust enrichment where an express contract governs the same subject matter. The district court granted the Developers' motion for summary judgment as to questions 5 and 7, and it dismissed the City's counterclaim for unjust enrichment.

On May 19, 2022, the City sought leave to amend its answer to add an eighth counterclaim: foreclosure of a real estate mortgage. The district court granted the City leave to amend, but the City never filed the amended counterclaim. So, the district court never ruled on the City's eighth counterclaim; therefore, we will not address it in this appeal.

On July 15, the City moved for summary judgment on all the Developers' claims, and it sought summary judgment on its second, third, and fourth counterclaims for breach of contract. The Developers resisted the City's motion. On October 6, the district court denied the City's motion for summary judgment. From October 17 to 31, the parties tried their case to the bench. The district

court then allowed each side to submit proposed findings of fact and conclusions of law.

The district court ultimately issued a 170-page decision captioned "Findings of Fact, Conclusions of Law and Judgment," which found that: (1) the City breached the Development Agreement, (2) the City tortiously interfered with the existing construction loan agreement between Parking LLC and Bankers Trust, (3) the Developers' claim for indemnity was moot, (4) the Developers' request for declaratory relief was moot, (5) the Developers failed to prove that the City tortiously interfered with their prospective business advantage, (6) the Developers' claims for injunctive relief were moot, (7) Parking LLC was entitled to judgment in the amount of $4,353,677 against the City, (8) the Developers were not entitled to any additional claimed damages, (9) title to the parcel of land on which the tower was to be constructed would remain with Tower LLC, (10) title to the parcel of land on which the theater was to be built would remain with Court LLC, (11) the Developers were entitled to judgment in their favor with respect to the City's breach of contract claims, and (12) the City dismissed its counterclaims under counts I (fraud in the inducement against Justin Mandelbaum) and V (fraudulent or negligent misrepresentation against all cross-claimants). The court also reaffirmed its ruling granting summary judgment to Parking LLC on the City's count VI (unjust enrichment), reaffirmed its ruling granting summary judgment to Parking LLC on the City's count VII (breach of contract (default and failure to repay the forgivable loan)), and taxed all court costs to the City.

The Developers filed a motion to amend under Iowa Rule of Civil Procedure 1.904(2). The district court granted the motion with respect to certain factual issues in the case, but it declined to modify its legal conclusions.

The City appealed and the Developers cross-appealed, each challenging different aspects of the district court's final judgment. The City argues that the district court erred (1) in refusing to hold that statutory discretionary function immunity protected the City from the Developers' tort claims; (2) in finding that the City, and not the Developers, had breached the Development Agreement; (3) in holding that the City had tortiously interfered with the contract between the Developers and the Bank; and (4) in awarding certain damages to the Developers and refusing to return title of the property to the City.

Besides opposing the City's appellate arguments, the Developers identified their own challenges to the district court's judgment. Specifically, the Developers argue that the district court erred (1) in not awarding damages for the long-term ownership and operation of the garage, (2) in failing to award reliance damages already incurred for the development of the Tower and the Theater, (3) in declining to give the Developers a so-called "tax true-up," (4) in failing to award damages for the value of a design error claim that would have belonged to Parking LLC, and (5) in refusing to award damages for foreclosure defense costs. We retained the case.

## II. Standard of Review.

This appeal primarily turns on the district court's resolution of claims and counterclaims for breach of contract. Generally, such claims are tried at law. *Atl. Veneer Corp. v. Sears*, 232 N.W.2d 499, 502 (Iowa 1975). As we have stated:

> Where the basic rights of the parties derive from the nonperformance of a contract, where the remedy is monetary, and where the damages are "full and certain, remedies are usually provided by actions at law, and equity has no jurisdiction." "If . . . both legal relief and equitable relief are demanded, the action is ordinarily classified according to what appears to be its primary purpose or its controlling issue."

*Van Sloun v. Agans Bros.*, 778 N.W.2d 174, 179 (Iowa 2010) (omission in original) (first quoting *Berry Seed Co. v. Hutchings*, 74 N.W.2d 233, 237 (Iowa 1956), and then quoting *Mosebach v. Blythe*, 282 N.W.2d 755, 758 (Iowa Ct. App. 1979)).

Here, the primary purpose of the action was to adjudicate rights under the Development Agreement. Although there were some equitable appendages to the case, the question of which party breached the contract and the consequent award of ascertainable monetary damages were the beating heart of the matter. Also, the district court ruled on objections and, at the end of the case, issued an order and judgment—as it would have in a law action—rather than a decree, which it would have issued had the case been equitable in nature. *See id.* at 178–79. Accordingly, our review is for correction of errors at law. *See id.*; Iowa R. App. P. 6.907. We are not bound by the district court's legal conclusions. *Id.* at 179.

"The standard of review for a breach of contract action is for correction of errors at law." *CMT Highway LLC*, ___ N.W.3d at ___, 2026 WL 1108827, at *4 (quoting *Iowa Mktg. Ctr. L.L.C. v. Baccam*, 841 N.W.2d 107, 110 (Iowa 2013)). "The trial court's factual findings have the force of a special verdict because this case was tried to the bench." *Id.* "Those findings bind our review 'if supported by substantial evidence.'" *Id.* (quoting Iowa R. App. P. 6.904(3)(*a*)). "Evidence is substantial if a reasonable mind would accept it as adequate to reach the same findings." *Id.* (quoting *Meyers v. Delaney*, 529 N.W.2d 288, 290 (Iowa 1995)). "We view the evidence 'in the light most favorable to the trial court judgment.'" *Id.* (quoting *Brokaw v. Winfield-Mt. Union Cmty. Sch. Dist.*, 788 N.W.2d 386, 388 (Iowa 2010)). "[W]e construe the evidence broadly to uphold, rather than defeat, the trial court's judgment." *Grall v. Meyer*, 173 N.W.2d 61, 63 (Iowa 1969). We review rulings on the remedies for breach of contract for correction of errors at law. *UE Loc. 893/IUP v. State*, 997 N.W.2d 1, 11 (Iowa 2023).

"We generally review a trial court's decision to deny or award fees for an abuse of discretion." *K.C. v. Iowa Dist. Ct.*, 6 N.W.3d 297, 301 (Iowa 2024). "An abuse of discretion occurs when a court's ruling is based on grounds that are unreasonable or untenable, 'or when the record lacks substantial evidence to support the court's conclusion.' " *Id.* (citation omitted) (quoting *Pierce v. Nelson*, 509 N.W.2d 471, 473 (Iowa 1993)). "We will presume the district court's discretionary decisions [on fee claims] are correct until the complaining party shows the contrary." *Lee v. State*, 906 N.W.2d 186, 194 (Iowa 2018).

**III. Analysis.**

We will first address the City's appeal. We determine that the district court's factual findings are supported by substantial evidence and are binding on appeal. We conclude that the district court correctly construed and applied the terms of the Development Agreement. We affirm the judgment against the City on the Developers' breach of contract claim and the damages awarded on that claim. We reverse the judgment against the City on the Developers' claim for tortious interference with their contract with the Bank. And we reject several additional grounds for reversal that the City proposes.

We then address the Developers' cross-appeal, which seeks additional damages against the City. Again, we determine that the district court's factual findings are supported by substantial evidence and are binding on this cross-appeal. We affirm the district court's rejection of the Developers' claims for additional damages.

**A. The City's Appeal.**

1. *Did the Developers breach the Development Agreement? Or was the City the breaching party?* Because the meaning of the Development Agreement is the focus of this case, we begin with the City's argument that it was the Developers,

and not the City, that breached the Development Agreement. The core of the City's argument is that the Development Agreement obligated the Developers to begin construction on either the Tower or the Theater by October 31, 2019. The Developers' failure to meet that deadline, the City argues, constitutes a breach of contract that excuses any alleged breach by the City. Not so, say the Developers, because the City was in talks to extend that deadline and didn't issue any notice of default until after contractual deadlines were effectively suspended by the COVID-19 pandemic.

The Developers argue that the district court correctly determined that the City breached the Development Agreement when it issued default notices in the summer of 2020, contrary to the *force majeure* clause and without affording the Developers an opportunity to cure the alleged default. We agree with the Developers.

To succeed on a breach of contract claim, the claimant must prove the following:

> (1) [T]he existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach.

*Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998).

In this case, elements (1) and (2) are undisputed: both sides agree that the contract was the Development Agreement, and they agree about its written terms and conditions. The dispute is: which party first breached the Development Agreement? If the first breach occurred when the Developers failed to begin construction on the Tower or Theater by the original October 31, 2019 deadline, then the City's notices of default the following summer would not be actionable. If, on the other hand, the contract required a notice of default and time to cure

before establishing a material breach, and if the City failed to follow that process before issuing the first default notice during the pandemic, then the district court's ruling that the City materially breached the Development agreement is correct.

We begin our analysis with the operative text of the Development Agreement. *See Dolly Invs., LLC v. MMG Sioux City, LLC*, 984 N.W.2d 168, 175 (Iowa 2023) (enforcing a lease contract provision requiring notice of default and opportunity to cure to establish material breach); *Genesis Equities, LLC v. Duffield*, No. 24–1105, 2025 WL 2924541, at *12 (Iowa Ct. App. Oct. 15, 2025) (determining that a contract required written notice of default and failure to cure before party could recover for material breach). Section 10.1 governs defaults and provides:

> A. Except as otherwise specifically provided in this Agreement, in the event of a default by either party under this Agreement, the aggrieved party may *by written Notice of Default* to the party in default, demand that it proceed immediately to cure or remedy such default, and, in any event, complete such cure or remedy within forty-five (45) days (or such other time as may be specifically provided herein) after receipt of such notice. Any default on an obligation to pay money shall be cured within five (5) business days after receipt of such notice. Notwithstanding the foregoing, if any non-monetary default reasonably requires more than forty-five (45) days to cure, *such default shall not constitute a breach of this Agreement if the defaulting party commences to cure the default promptly upon receipt of the notice of the default and with due diligence thereafter continuously prosecutes such cure to completion.*

> B. In the event that a Notice of Default is given as provided above and action to cure or remedy the default is not promptly taken or not diligently pursued, or the default is not cured or remedied within the time allowed, then the party in default may be declared to be in breach of this Agreement by the aggrieved party. In the event of a breach of this Agreement, in addition to such other rights as the aggrieved party may have hereunder, the aggrieved party may institute proceedings for damages for breach of contract. In any claim, action or civil proceeding wherein damages are sought for breach of this Agreement, City shall have the same rights and

liabilities as a private non-governmental party for any breach of this Agreement.

(Emphasis added.) Section 10.4 of the Development Agreement provides:

Except for an obligation to pay money to the other pursuant to this Agreement, neither City nor Developer shall be considered in breach of, or in default of, its obligations with respect to this Agreement, or any portion thereof, including redevelopment, or the beginning and completion of construction of the Improvements, in the event of an enforced delay in the performance of such obligations due to unforeseeable causes beyond its control and without its fault or negligence, including, but not restricted to, temporary injunctions, acts of God, acts of the public enemy, war, or terrorism, acts of government (provided City may not rely upon its own acts as reason for delay), acts of the other party, fires, floods, epidemics, quarantine restrictions, strikes or other labor disruptions, freight embargoes, economic or financial market collapse causing a national loss of available financing upon commercially reasonable terms, and unusually severe weather or delays of subcontractors due to such causes; it being the purpose and intent of this provision that in the event of the occurrence of any such enforced delay, the time or times for performance of the obligations of City or of Developer, as the case may be, shall be extended for the period of the enforced delay: Provided, that the party seeking the benefit of the provisions of this article shall: i) within twenty (20) days after the beginning of any such enforced delay, have notified the other party thereof, in writing, and of the cause or causes thereof, and setting forth the anticipated extension required as a result of the enforced delay; and, ii) exercise reasonable diligence to mitigate the event and the impact thereof.

Section 10.4 insulates either party from being found in default or breach of contract whenever one of the enumerated enforced delays occurs. To avail itself of this provision, a party needs only to inform the other, in writing, within twenty days, about the cause or causes of the enforced delay, and it must exercise reasonable diligence to mitigate the event and its impact.

It is undisputed that the Developers failed to commence construction of the Tower or Theater by October 31, 2019. The City argues that this date having passed by June 24, 2020, the default was essentially incurable—there was no way for the Developers to go back and do something they had failed to do.

Alternatively, the City argues that once it had issued default notices and the cure period had fully elapsed, then the Developers had breached the contract. The City asserts that Section 10.4 does not apply to save the Developers from the breach or default because the original delay—that is, the failure to begin construction of the Tower or Theater on October 31, 2019—was solely attributable to the Developers' own actions and occurred before the COVID-19 pandemic began.

But the City's arguments depend on its own interpretation of the contract. The district court reached a different, more plausible interpretation based on the contract terms and the extrinsic evidence presented. The missed October 31, 2019 deadline was not a trump card that the City had in its back pocket and that it could play at any time and declare, "Game over." Rather, once the City issued the default notices, the Developers had forty-five days to cure (or potentially longer, if they commenced the cure promptly). But that time period was put on hold by the *force majeure* clause in 10.4. Indeed, it is undisputed that the City failed to issue default notices until after the Developers had already invoked the *force majeure* clause. Not only that, but the City also repeatedly reassured the Developers before then that it was "NOT" issuing notices of default. Indeed, Sanders testified at trial that no default existed until it was declared to establish a breach and that "the Developers were entitled to an opportunity to cure" after a missed deadline. The district court properly relied on the parties' course of performance that demonstrated a notice of default and opportunity to cure was required before the Developers could be found in breach. *See Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 436 (Iowa 2008) ("Another relevant rule of contract interpretation requires that '[w]herever reasonable, the manifestations of intention of the parties to a promise or agreement are

interpreted as consistent with each other and with any relevant course of performance . . . .' " (alteration in original) (quoting Restatement (Second) of Contracts § 202(5) (A.L.I. 1979))).

We therefore affirm the district court's determination that the City could not pursue remedies for breach of contract unless the Developers failed, after first receiving a notice of default, to take appropriate remedial action to cure the default. But once the Developers invoked Section 10.4, the clock stopped on their deadline to cure, and any notice of default could not trigger a breach. The City concedes that the COVID-19 pandemic was a *force majeure* within the meaning of the agreement. And the district court's finding that the COVID-19 pandemic qualified as an enforced delay is well supported by the record. The district court could properly determine that it was the City, and not the Developers, who breached the Development Agreement. We affirm the district court's determination that the City breached the Development Agreement.

2. *Is the City liable for tortious interference with the contract between the Developers and Bankers Trust?* The Developers alleged that Sanders knew that, by issuing the default notices, he would undermine the Developers' loan agreement with the Bank, souring the Bank on financing extensions or future lending. The City argues that the Developers failed to prove tortious interference. The district court found that the City had tortiously interfered with the Developers' existing contract with the Bank by issuing the notice of default in the summer of 2020—the same conduct found to be a material breach of the Development Agreement.

Generally, it is not "possible to tortiously interfere with a contract to which one is a party," and we have "decline[d] to recognize a tortious interference claim" when "[n]o third parties were involved." *Klooster v. N. Iowa State Bank*,

404 N.W.2d 564, 570 (Iowa 1987). "In such cases a tort remedy is not necessary as the plaintiff has an adequate remedy for breach of contract." *Baysden v. Hitchcock*, 553 N.W.2d 901, 904 (Iowa Ct. App. 1996); *see also Tyler v. Percell*, 506 N.W.2d 805, 808 (Iowa Ct. App. 1993) ("The rationale behind such a holding is where both parties are parties to the contract, it is a breach of the agreement and the proper remedy is a suit for breach of contract."); *Irons v. Cmty. State Bank*, 461 N.W.2d 849, 858 (Iowa Ct. App. 1990) (holding that the "trial court erred by instructing the jury that a party may [tortiously] interfere [with] its own contract"); *Klooster*, 404 N.W.2d at 570 (noting the adequacy of contract remedy).

We reiterate that "[t]his tort is not committed by parties to the contract; the tortfeasor must interfere with a contract between another and a third person." *Grahek v. Voluntary Hosp. Coop. Ass'n of Iowa, Inc.*, 473 N.W.2d 31, 35 (Iowa 1991). Here, the Bank is the third party. But is more required to recover in tort than that the City breached its contract with the Developers? In *Tyler v. Percell*, the court of appeals reinstated a tortious interference claim between parties to a contract when the breaching defendant separately conspired with third parties to withhold rents from the plaintiff. 506 N.W.2d at 807, 808. But neither the Developers nor the district court cite a case where a tortious interference claim between contracting parties was upheld based on a breach of their contract alone, without additional improper actions to interfere with the separate contract with a third party.

To recover for the tort of intentional interference with a contract, the Developers had the burden to prove: "(1) the existence of a contract with a third party, (2) the defendant knew about the contract, (3) the defendant intentionally and improperly interfered with the contract, (4) the interference caused the third-party not to perform or made performance more burdensome or expensive,

and (5) the plaintiff suffered damages." *Larew v. Hope L. Firm, P.L.C.*, 977 N.W.2d 47, 63 (Iowa 2022).

It is undisputed that the Developers had a contract with the Bank and that the City knew about that contract. The fighting issue is whether Sanders's actions in issuing the notice of default constituted intentional and *improper* interference with the contract between the Developer and the Bank. We conclude that it did not.

The Restatement (Third) of Torts, Liability for Economic Harm, provides guidance. Section 17 states:

(1) A defendant is subject to liability for interference with contract if:

(a) a valid contract existed between the plaintiff and a third party;

(b) the defendant knew of the contract;

(c) the defendant engaged in wrongful conduct as defined in Subsection (2);

(d) the defendant intended to cause a breach of the contract or disruption of its performance;

(e) the defendant's wrongful conduct caused a breach of the contract or disruption of performance; and

(f) the plaintiff suffered economic loss as a result.

(2) Conduct is wrongful for purposes of this Section if:

(a) the defendant acted for the purpose of appropriating the benefits of the plaintiff's contract;

(b) *the defendant's conduct constituted an independent and intentional legal wrong*; or

(c) the defendant engaged in the conduct for the sole purpose of causing harm to the plaintiff.

Restatement (Third) of Torts: Liab. Econ. Harm § 17, at 127 (A.L.I. 2020) (emphasis added).

When considering subsection (2), we note that the Developers do not argue that the City acted with the intent to appropriate the Developers' contractual advantage or for the sole purpose of harming the Developers' lending agreement with the Bank. So, the City's conduct—if it is to be the basis for liability—must constitute an independent and intentional legal wrong.

Helpfully, Comment *e* provides guidance as to the meaning of independent wrongs, stating: "An independent wrong, for purposes of this Section, can be conduct regarded as culpable by the law of tort, by criminal law, by equity, or by regulation. It does not include an act of negligence or *breach of contract.*" *Id.* § 17 cmt. *e*, at 130 (emphasis added). The problem, then, for the Developers is that they rely on the City's breach of the Development Agreement as the act that interfered with their contract with the Bank. But the City's breach of its contract with the Developers, without more, cannot support their separate tort claim for intentional interference with their contract with the Bank. *See id.*; *see also Berry & Gould, P.A. v. Berry*, 757 A.2d 108, 115 (Md. App. Ct. 2000) ("Pertinent to this case is the rule that breach of a contract between the plaintiff and the defendant is not a basis for the interference tort, if the interference is simply incidental to the breach.").

Here, any interference with the Developers' contract with the Bank was merely incidental to the City's breach of contract in issuing the notice of default during the pandemic. The Developers do not identify, and the district court did not find, any other actions by the City that interfered with the Developers' contract with the Bank. The City acted to protect its own interests under the Development Agreement, not to maliciously interfere with the Developers'

lending agreement with the Bank. Iowa law does not support a recovery in tort under these circumstances.

A contrary holding allowing a tort remedy for a breach of contract would undermine the predictability and certainty that is vital to business law and freedom of contract. In our view, awarding potentially open-ended tort damages based on a breach of the parties' contract is at odds with the contract law principle of "efficient breach." As the Delaware Supreme Court explains:

> Efficient breach is a concept that recognizes that "properly calculated expectation damages increase economic efficiency by giving the other party an incentive to break the contract if, but only if, he gains enough from the breach *that he can compensate the injured party for his losses* and still retain some of the benefits from the breach."

*Leaf Invenergy Co. v. Invenergy Renewables LLC*, 210 A.3d 688, 703 (Del. 2019) (en banc) (quoting *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 n.39 (Del. 2013)). "In other words, efficient breach is based on the idea that a party might find it economically worthwhile to breach a contract because that breach yields economic benefits that exceed the value of the damages it must pay to the non-breaching party." *Id.* In a similar vein, the United States Court of Appeals for the Seventh Circuit noted that "[b]ecause, at least in theory, this kind of [efficient] breach makes society better off, the law does not treat it as disfavored." *Stop-N-Go of Madison, Inc. v. Uno-Ven Co.*, 184 F.3d 672, 680 (7th Cir. 1999) (citing, *inter alia*, E. Allen Farnsworth, *Contracts*, § 12.8, at 194–95 (2d ed. 1990) ("Most courts have not infringed on the freedom to keep or break a contract traditionally afforded a party by the common law and endorsed by the notion of efficient breach.")); *see also NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 35 (Del. Ch. 2009) ("Delaware law generally elevates contract law over tort to allow parties to order their affairs and bargain for specific results . . . . A claim of

conspiracy to commit tortious interference against a party to the contract would undercut these principles and replace the predictability of the parties' agreement with a far less certain, after-the-fact, judicially-fashioned tort remedy." (citation omitted)).

Applying efficient breach principles, the Delaware Supreme Court held that a landlord suing its tenant for tortious interference with third-party contracts must prove malice or bad faith. *Bhole*, 67 A.3d at 453. The court determined that "there can be no non-contractual liability . . . unless the plaintiff pleads and proves that the [defendant] sought not to achieve permissible financial goals but sought maliciously or in bad faith to injure plaintiff." *Id.* (omission in original) (quoting *Shearin v. E.F. Hutton Grp., Inc.*, 652 A.2d 578, 591 (Del. Ch. 1994)). Here, the district court made no findings that the City acted maliciously or in bad faith when it issued the notice of default.

We decline to graft tort remedies onto the Developers' remedies for the City's breach of contract. Contract law (including the recovery of foreseeable consequential damages) provides the Developers' sole remedy here. We vacate the district court's judgment that the City was liable for tortious interference with the Developers' contract with the Bank.

The district court's monetary award remains unchanged, however, because the district court awarded precisely the same damages for the City's breach of contract. Even if we were to affirm the judgment against the City for its tortious interference with the Developers' contract with the Bank, the Developers are entitled to only one satisfaction of their damages and not a double recovery. "A successful plaintiff is entitled to one, but only one, full recovery, no matter how many theories support entitlement." *Clark-Peterson Co. v. Indep. Ins.*, 514 N.W.2d 912, 915 (Iowa 1994). Indeed, the purpose of damages is to restore

an injured party to the position he occupied before the injury; we do not award duplicative damages. *Team Cent., Inc. v. Teamco, Inc.*, 271 N.W.2d 914, 925 (Iowa 1978) (en banc). We vacate the damages awarded for tortious interference but affirm the identical damages awarded for breach of contract.

3. *Does the discretionary function immunity in the Iowa Code § 670.4(1)(c) protect the City from the Developers' tort claims?* Because we vacate the award for tortious interference with contract, we do not reach the question of whether the discretionary function immunity in Iowa Code § 670.4(1)(*c*) (2020) applies here.

4. *Did the Development Agreement allow for damages outside of the special fund?* The City contends that the district court erred by awarding damages outside of the so-called "special fund" established under Iowa Code § 403.19(2), a statute governing the division of revenue from tax-increment financing. The City relies on Section 9.8 of the Development Agreement, which provides in relevant part:

> A. *The advances to be paid by the City* on the Parking Grant, the South Building Grant, the Residential Grant, and the Parking Shortfall Loan, and all deposits to the Sinking Fund (collectively the "Deferred Grants") shall be paid by City solely from the special fund financed by the division of revenue pursuant to Iowa Code § 403.19(2) from taxes levied on the Metro Center Urban Renewal Project Area. *The obligations of City under this Agreement shall not constitute a general obligation of the City.*

(Emphasis added.) The City interprets this section as a limitation on damages for breach of contract. We disagree. Section 9.8, by its terms, only limits payments from the economic development fund to "advances to be paid by the City." The Developers sued the City for breach of contract, not to compel "payment of the City's economic assistance commitments." The district court correctly found the following,

> [Section 9.8], by its plain language, indicates that the funding the City promised to provide under the development agreement comes

> from the taxes levied on the Metro Center Urban Renewal Project Area. This means the parties agreed that if the tax revenue was not sufficient to fund the Deferred Grants the City was not obligated to make payments from its general fund to the Deferred Grants. It did not limit the City's payment of damages for a breach of the development agreement.

We agree. Section 9.8 nowhere mentions the words "damages" or "breach." The City is a sophisticated party; it could have included language expressly limiting recoverable damages for breach of the Development Agreement. It did not. We enforce the unambiguous contract language as written. *Iowa Fuel & Mins., Inc. v. Iowa State Bd. of Regents*, 471 N.W.2d 859, 862–63 (Iowa 1991) ("When a contract is not ambiguous, it will be enforced as written . . . ."). We decline to read into Section 9.8 any limitation on the City's liability for breach of contract.

The district court correctly relied on Section 10.1(C), which the court quoted and accurately found "specifically provides . . . that '[i]n any claim, action or civil proceeding wherein damages are sought for breach of this Agreement, *City shall have the same rights <u>and liabilities</u> as a private non-governmental party.*' " (Alteration in original.) Section 10.1(C) is the more specific provision and controls over any conflicting general language. *See* Iowa Code § 4.7. Section 10.1(C) specifically addresses damages for breach of the Development Agreement and provides that the City would be liable for such a breach "as a private non-governmental party." Private parties are not shielded from liability under the statute governing tax-increment financing. Reading the Development Agreement as a whole, as we must, we agree with the district court that no provision of the contract limits "any damage a court may award against the City for a breach of the development agreement."

5. *Should the Developers retain title to the property?* The City contends that Section 10.2(C) of the Development Agreement permits the City to recover title to the tower and theater parcels. Section 10.2(C) begins:

> C. *Failure to Timely Close on financing for both the South Building and the Residential Building.* If the owners of the South Parcel and Residential Parcel are both determined to be in breach of their individual obligation to cause construction of their respective Buildings to be timely commenced pursuant to Section 6.2, then as an alternative to the remedies set forth in paragraphs D and E below, City may elect, in its sole discretion, to acquire the Property and all improvements thereon upon the following terms and conditions: . . . .

In our view, the district court's findings preclude the City's request for return of those properties under the contract. The district court found the City materially breached the Development Agreement. The district court further found the following,

> [T]he Developers did not breach the agreement as provided in section 10.2(D)(1). Consequently, the City is not entitled to the remedy provided under that section which is the return of the title to the theater parcel by special warranty deed. The same result would occur under section 10.2(E)(1) as it pertains to the title to the tower parcel. Because the court determined that the Developers did not breach the development agreement the City's claim is not supported by any provision of the development agreement. There is no basis for the court to order a return of the titles to these parcels to the City.

The district court's findings are supported by substantial evidence, and the court correctly construed the contract to deny transfer of title to the City. We affirm its ruling that leaves title to the tower and theater parcels with Tower LLC and Court LLC, respectively.

6. *The City's challenge to the damages awarded for breach of contract.* The district court, after an extensive review of the Developers' evidence including the testimony of their expert, found that the Developers had proven damages of $4,353,677 for the City's breach of contract. The district court found that

Parking LLC would have received that amount had it been allowed to complete the garage shortly after the City's breach.

Specifically, the district court found that the Developers were within approximately four months of completing the garage when the Bank filed its foreclosure action in response to the City's June 2020 notice of default (the breach). The breach and resulting foreclosure by the Bank prevented the Developers from completing the garage and thereby earning the development fee and related savings over the stipulated price. The foreclosure also triggered higher default interest costs. The district court's factual findings on the resulting damages are supported by substantial evidence.

"[A]s a general matter, '[e]very breach of contract gives the injured party a right to damages against the party in breach.' " *UE Loc. 893/IUP*, 997 N.W.2d at 11 (second alteration in original) (quoting Restatement (Second) of Contracts § 346 cmt. *a,* at 110 (A.L.I. 1981)). "In particular, 'when a contract has been breached the nonbreaching party is generally entitled to' damages that will place that party 'in as good a position as he or she would have occupied had the contract been performed.' " *Id.* at 11–12 (quoting *Midland Mut. Life Ins. v. Mercy Clinics, Inc.*, 579 N.W.2d 823, 831 (Iowa 1998)). "This is sometimes called 'benefit of the bargain' damages." *Id.* at 12 (quoting *Midland Mut. Life Ins.*, 579 N.W.2d at 831). Based on the district court's factual findings, we affirm its award of benefit of the bargain (expectancy) damages of $4,353,677.

**B. The Developers' Cross-Appeal.** The Developers challenge the district court's rejection of their claims for additional damages. At trial the Developers divided their alleged damages into four overarching categories and numerous subcategories. They are as follows:

- Category (1): Garage Completion Damages, and its subcategories:

- o (1-A) Development fee on the garage.
- o (1-B) Savings on the garage.
- o (1-C) Interest savings on the garage.
- o (1-D) Jump ramp insurance claim on the garage.

In the City's appeal, as noted above, we affirm the award to the Developers of $4,353,677 in Category (1) across subcategories (1-A), (1-B), and (1-C). But the district court rejected the Developers' claims for additional damages under (1-D) as well as for the following categories:

- Category (2): Lost Profits from Garage Operation and Ownership, and its subcategories:
  - o (2-A) Net present value of residual equity value of garage.
  - o (2-B) Net present value of garage management fee.
  - o (2-C)2 Net present value of environmental expenses incentive payment.
  - o (2-D) Market value of restaurant and retail space in garage (sales approach).
- Category (3): Either:
  - o (I) Lost Development Opportunity for the Tower, which includes reconciled profit calculation on residential development equity investment and reconciled profit calculation on hotel development equity investment; or
  - o (II) Alternative Claims—Losses Suffered Regardless of Developers' Equity Interest in Tower, which consists of four subcategories:
    - ▪ (3-A) Architecture on tower paid by the Developers.

---

2The Developers do not appeal the district court's denial of subcategory (2-C) damages.

- (3-B) Predevelopment expenses on Tower paid by the Developers.

- (3-C) Tower hard costs funded by the Developer in the Garage (excluding restaurant).

- (3-D) Development fee on the Tower.

- Category (4): Lost Development Opportunity for the Theater Building, and its subcategories:

  o (4-A) Architecture on the Theater paid by the Developers.

  o (4-B) Predevelopment expenses on the Theater paid by the Developers.

  o (4-C) Theater hard costs funded by the Developers in the Garage.

  o (4-D) Development fee on the Theater.

In addition to these primary damages, the Developers sought two categories of ancillary damages: foreclosure defense costs and a so-called "tax gross-up."

The district court determined, however, that the Developers failed to prove any additional damages and that they were not entitled to foreclosure defense costs or a tax gross-up. We agree.

We begin our review of the Developers' cross-appeal by reiterating basic principles:

> A plaintiff is required to establish a claim of damages with some reasonable certainty, showing a rational basis for ascertaining their amount. On the other hand a plaintiff is not required to show the amount with the same degree of certitude required for a showing of the fact they were sustained.

*Conley v. Warne*, 236 N.W.2d 682, 687 (Iowa 1975). "If it is speculative and uncertain whether damages have been sustained, recovery is denied. If the uncertainty lies only in the amount of damages, recovery may be had if there is proof of a reasonable basis from which the amount can be inferred or approximated." *Id.* at 687–88 (quoting *Northrup v. Miles Homes, Inc. of Iowa*,

204 N.W.2d 850, 857 (Iowa 1973)); *accord Conrad v. Dorweiler*, 189 N.W.2d 537, 540 (Iowa 1971).

To recover for loss of profits, the claimant must meet three requirements: (1) the damages must have been within the contemplation of the parties at the time the contract was made, (2) the damages must be the natural and direct result of the breach, and (3) the damages must be established with reasonable certainty—they cannot be conjectural or speculative. *See Dopheide v. Schoeppner*, 163 N.W.2d 360, 367 (Iowa 1968); *see also Harsha v. State Sav. Bank*, 346 N.W.2d 791, 797 (Iowa 1984) (applying the lost profits analysis).

When evaluating a damage award for lost profits, our caselaw distinguishes between two types of businesses. For established businesses, the above-stated rule applies, and the district court may use the business's historical profits as a baseline for determining damages. For new businesses, though, the analysis is more complicated. We apply Iowa's "new business rule." That rule is predicated on the idea that the profits for an untested business venture are necessarily more speculative than those of a going concern. We have long recognized the following:

> Expected profits from a new commercial enterprise [are] too remote and speculative to warrant judgment for their loss because there are no available data of past business from which the fact of anticipated profits could have been established. But anticipated profits may be recovered, if established with reasonable certainty, as damages for the interruption of the use of an established business in actual operation.

*City of Corning v. Iowa-Neb. Light & Power Co.*, 282 N.W. 791, 796 (Iowa 1938). "The new business rule is not absolute. If factual data are presented which furnish a basis for compilation of probable loss of profits, evidence of future profits should be admitted and its weight, if any, should be left to the jury." *Harsha*, 346 N.W.2d at 798. So, where there are projections of profitability based

on expert experience in the industry and where the business proprietors have relevant experience and are willing to exert the effort necessary to bring the business to success, we have allowed an award of damages. *See id.* at 798–99.

With these luminaries marking our path, we turn to the Developers' individual claims.

1. *Should the Developers have received damages for subcategory (1-D) the jump ramp insurance claim on the garage?* The Developers argue that the district court should have awarded damages for their nascent claim against their architect. According to the Developers, the design firm that worked on the parking garage made numerous errors in designing the ramps that connect the levels in the parking garage. These errors allegedly damaged the Developers in an amount exceeding $1.3 million. The Developers claim they would have sued the design firm, but when the City purchased the garage, it abandoned the claim. Accordingly, the Developers seek damages for the potential damages they would have acquired from a lawsuit against their design firm.

The district court rejected the Developers' claim. It found that the Developers failed to prove that they would have succeeded in obtaining an insurance payout or other settlement from the design firm. The district court noted that the receiver for the garage property sent the design firm a demand letter, to which the firm never responded. The Developers had the burden to prove their "case within a case" against the design firm. The district court found that the potential recovery against the design firm was too speculative to support a damage award against the City. That finding is supported by substantial evidence, so we affirm the judgment on that issue.

2. *Should the Developers have received damages for long-term ownership and operation of the parking garage?* The Developers argue that the district court

erred when it refused to award damages for the long-term operation of the parking garage. Essentially, under subcategory (2-A), they requested the net present value of the cash flow from the operation of the parking garage, a sum of $4,357,750. Under subcategory (2-B), they requested the net present value of the management fee stipulated in the Development Agreement, a sum of $3,289,859. And, under subcategory (2-D), they requested the lost rental value of the retail and restaurant spaces built into the parking garage, a sum of $3,381,702.

The district court denied the Developer recovery on these damages because the claims lacked historical support—there was not sufficient data from the parking garage itself or from similarly situated businesses to prove beyond conjecture the amount of claimed damages.

The district court's findings are supported by substantial evidence. When a plaintiff claims damages for lost profits, the damages—not merely the fact of damages but also the amount—must be proven with reasonable certainty. *Dopheide*, 163 N.W.2d at 367. Here, all three subcategories (2-A, -B, and -D) were contingent upon unrealized future events.

Subcategory (2-A) represents the lost profits that the Developers expected to earn from owning and operating the garage. But, as the district court noted, this revenue stream depended on several speculative contingencies. First, the Developers assumed that the garage would have a useful life of 100 years. Second, their revenue projections relied on the existence of the Tower and the Theater, as well as a stream of revenue from parking for the Des Moines Farmers Market. Finally, there was no testimony that the numbers provided were in any way related to past operational income of similarly situated parking garages. For a new and unique business, especially one as integrated as the development

promised to be, it suffices to say that the district court's finding that the damages in subcategory (2-A) were too speculative is well supported by the record.

As for subcategory (2-B), the Developers claim that they are entitled to recover a garage management fee that was contemplated in the Development Agreement. But, as the district court aptly noted, the garage management was anchored to a percentage of the projected garage revenue and expenses. Again, the Developers failed to prove with reasonable certainty the expected revenue from the garage; consequently, they cannot prove with reasonable certainty the amount of the management fee. The district court's refusal to award damages under subcategory (2-B) is supported by substantial evidence.

Subcategory (2-D) comprises damages for the lost market value of the restaurant and retail space in the garage. The district court found that the Developers' damages calculations were based on speculation, lacking any historical data. We agree. The Developers were to establish a new business with a unique structure of interlacing buildings and firms; their revenue projections lacked comparators or a historical foundation. The district court found that the damages were not ascertainable with reasonable certainty. That finding is supported by substantial evidence.

Perceiving no error in the district court's ruling, we conclude that the Developers were not entitled to any of the damages enumerated under subcategories (2-A, -B, or -D).

3. *Should the Developers have received reliance damages for expenses already incurred for the development of the Tower and the Theater?* The Developers argue the district court should have awarded them reliance damages for expenses incurred toward the construction of the Tower and Theater.

Reliance damages are intended to put the nonbreaching party in the same position it would have occupied had it never formed the contract. *Scott v. Grinnell Mut. Reins.*, 653 N.W.2d 556, 562 (Iowa 2002). To recover for reliance damages, the nonbreaching party must prove actual expenditures made or forbearance of other opportunities prior to the repudiation of the contract. *Id.* But the plaintiffs' recovery for reliance damages can never exceed the contract price. *Id.*

Here, the Developers argue that they took certain actions in reliance on the Development Agreement. Specifically, they spent money on architectural drawings and pre-development expenses for the Tower and Theater and on special features to integrate the parking garage with the Tower and Theater. For the tower, these expenses comprised subcategories (3-A, -B, and -C), summing to $8,063,027; and, for the Theater, these expenses comprised subcategories (4-A, -B, and -C), summing to $528,884.

The district court found that the Developers were not entitled to recover these damages because the damages were paid entirely by the construction loan, meaning that, when the City purchased the garage from the Bank, it paid off the construction loan. In short, the Developers suffered no actual out-of-pocket reliance damages.

The Developers concede that they are not out of pocket for those expenditures, but they argue that they were entitled to the difference between the stipulated cost for the garage and the actual lower cost, or savings, which the district court correctly awarded as expectancy damages. So, by including Tower and Theater expenses in the construction loan, the "savings" to be awarded the Developers fell by the same amount. The City does not challenge the math, or the amount of the actual expenditures for the Tower and Theater. Rather, the City argues that the Developers are not entitled to recover for

amounts they never paid, because unlike the nearly completed garage, the Developers never showed they would have built the Tower or Theater but for the City's breach.

The City in effect paid for the Tower and Theater expenses once it paid off the construction loan that funded those expenses. In our view, the district court was not required to force the City to pay twice for the same expenses. And here, the district court allowed the Developers to retain title to the Tower and Theater parcels without paying for them. The Developers would get a windfall if the district court awarded reliance damages for expenses the Developers never paid—i.e., expenses for the land on which the Tower and Theater were to sit, land for projects the Developers were unlikely to complete even without the City's breach and that the Developers still own and that they acquired at no cost.

The district court found that the ultimate completion and successful operation of the Tower and Theater was too speculative to support awarding additional damages to the Developers. We agree. The district court correctly treated expenditures for the nearly completed garage differently than costs incurred by other parties on the Tower and Theater projects where the Developers had not yet broken ground.

The district court also found that the Developers retained ownership of the architectural drawings for the Tower and Theater. Those drawings have no value to the City. So an additional award cannot be supported under a restitution theory. We ordinarily do not award both expectancy and reliance or restitution damages for the same breach of contract. *See, e.g., Mobley v. Boyt Farms Co.*, 126 N.W.2d 280, 283–84 (Iowa 1964). *See generally* Restatement (Second) of Contracts § 344, at 102–03 (A.L.I. 1981) (contrasting purposes of expectancy, reliance, and restitution theories). The district court correctly declined to mix

and match reliance and expectancy damages because those remedies are mutually exclusive. The reliance remedy restores the nonbreaching party to "as good a position as he would have been in had the contract not been made." Restatement (Second) of Contracts § 344(b), at 102 (A.L.I. 1981). By contrast, expectancy damages provide the nonbreaching party with "the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed." *Id.* § 344(a), at 102. The Developers can't have it both ways.

> Under the election of remedies doctrine, the injured party "may treat the contract as void and seek the damages [known as 'reliance damages'] that will restore him to the position he was in immediately prior to entering the contract," or, alternatively, "he may elect to affirm the contract, insist upon the benefit of his bargain, and seek the damages [called 'expectation damages'] that would place him in the position he would have been in had the contract been completely performed." Significantly, these two distinct remedies are mutually exclusive and, as such, may not both be recovered by the injured party.

*Tampa Pipeline Transp. Co. v. Chase Manhattan Serv. Corp.*, 928 F. Supp. 1568, 1584 (M.D. Fla. 1995) (alterations in original) (quoting *Rector v. Larson's Marine, Inc.*, 479 So. 2d 783, 785 (Fla. Dist. Ct. App. 1985)). Thus, the Developers cannot recover "for both [their] lost profits and [their] expenditures made in reliance upon the contract." *Resorts Int'l, Inc. v. Charter Air Ctr., Inc.*, 503 So. 2d 1293, 1296 (Fla. Dist. Ct. App. 1987).

The district court's factual findings are supported by substantial evidence, and we discern no legal error. We affirm the district court's judgment declining to award damages for subcategories (3-A, B, and C) and (4-A, B, and C).

4. *Should the Developers have received a "tax gross-up"?* The Developers argue that they are entitled to a "tax gross-up" on the damages they received for the City's breach of contract. A tax gross-up is an equalization payment that negates the tax burden applicable to an award of money damages. Because damages awarded after a lawsuit are often taxable, sometimes a plaintiff stands to lose in taxes some of the compensation to which he would otherwise be entitled. This is especially true in cases where, but for the defendant's breach of contract, the plaintiff would have received a nontaxed asset. Some courts avoid this eventuality by awarding additional monies to zero out the plaintiff's tax burden. *See Anchor Sav. Bank, FSB v. United States*, 123 Fed. Cl. 180, 183 (2015). The court calculates the amount of the tax gross-up by projecting the plaintiff's tax liability for the portion of the award that is subject to gross-up. *Id.* The plaintiff's tax rate must be reasonably certain. *Id.* As the United States Court of Appeals for the Second Circuit wrote long ago:

> To calculate such an item of damages permits of wide speculation. If such damages are awarded, the amount of tax differential will depend on the method by which appellee has kept his books—cash or accrual basis. Damages would vary in each instance. Another consideration would be the taxpayer's financial position and other earnings of the year which would enter into the calculations so that it would be highly speculative to find the amount of the damages due to appellee's breach of contract.

*Paris v. Remington Rand, Inc.*, 101 F.2d 64, 68 (2d Cir. 1939). Where, as here, there is no evidence indicating against whom the taxes will be levied, or any historical data indicating how the plaintiff-entity has been taxed, the plaintiff fails to show with reasonable certainty the tax rate, and, therefore, the tax gross-up claim fails for want of proof.

Iowa courts routinely consider the tax consequences of property divisions in marital dissolutions. *See* Iowa Code § 598.21(5)(*j*). The Developers

acknowledge that our court has never upheld or otherwise addressed the propriety of a tax gross-up award in commercial business litigation. In *Guge v. Kassel Enterprises, Inc.*, we recently declined to award damages for anticipated future capital gains taxes as too speculative. 962 N.W.2d 764, 773 (Iowa 2021). The Developers' tax gross-up claim meets the same fate.

The Developers argue that, had the contract been fulfilled, they would have received real estate instead of money. That real estate would have been taxed differently from the lump sum payment that they received as damages. Therefore, to make them whole, the court should have increased the monetary award to zero out the future taxes. But the district court found that the amount of the tax gross-up was too speculative. Parking LLC would receive the damages award. As an LLC, it can choose to be taxed either as a corporation or as a partnership, and that election would change who was taxed (either Justin and Sean Mandelbaum or Parking LLC) and how they would be taxed (as a pass-through, if a partnership, or as an entity, if a corporation). The Developers failed to offer into evidence any tax returns for the individuals or entities. The district court found the Developers failed to prove their entitlement to a tax gross-up and denied recovery on that claim based on insufficient evidence. The district court's findings are supported by substantial evidence, and we affirm.

5. *Should the Developers have been awarded damages for foreclosure defense costs?* Finally, the Developers argue that the district court should have awarded them damages for the money they spent in defending against Bankers Trust's foreclosure action. According to the Developers, if the City had not breached the Development Agreement, then they, the Developers, would not have incurred legal fees to defend against the Bank's foreclosure action. Therefore, the

Developers conclude, the district court should have reimbursed them for the amounts they spent on defending against the Bank's claims.

The Developers had the burden to prove their entitlement to attorney fees and the amount thereof. *Lynch v. City of Des Moines*, 464 N.W.2d 236, 238 (Iowa 1990) (en banc). "Iowa follows the American rule: 'the losing litigant does not normally pay the victor's attorney's fees.' " *NCJC, Inc. v. WMG, L.C.*, 960 N.W.2d 58, 62 (Iowa 2021) (quoting *In re Guardianship & Conservatorship of Radda v. Wash. State Bank*, 955 N.W.2d 203, 214 (Iowa 2021)). A party may obtain attorney fees incurred in defending a "third-party suit" when the suit is "brought about or caused by either the tortious conduct or breach of contract" of the defendant. *N.H. Ins. v. Christy*, 200 N.W.2d 834, 840 (Iowa 1972); *Turner v. Zip Motors*, 65 N.W.2d 427, 432 (Iowa 1954). But the Developers are not entitled to recover fees incurred litigating against the City. *Dier v. Peters*, 815 N.W.2d 1, 10 (Iowa 2012). The district court did not allow the Developers to make an end run around the American rule by seeking fees through their third-party litigation with the Bank.

The district court determined that the Developers failed to prove that the amount claimed for fees ($138,629) was spent on foreclosure defense rather than on their litigation with the City. Notably, the Developers' appellate briefing points to no fee affidavit or itemized billing statement that properly segregated their fees incurred exclusively on litigating the foreclosure action against the Bank. "[T]o ensure that all necessary data is before the court, attorneys are generally required to submit detailed affidavits which itemize their fee claims." *Boyle v. Alum-Line, Inc.*, 773 N.W.2d 829, 832 (Iowa 2009) (per curiam) (alteration in original) (quoting *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 127 (8th Cir. 1975)). The district court found the following:

The development agreement does not provide attorney fees for the prevailing party. While The Developers assert that these expenses were for the foreclosure proceedings, they do not delineate the services provided by their counsel. The foreclosure action was filed on September 14, 2020, by Banker's Trust. On September 23, 2020, the Developers filed their cross-petition against the City for the claims litigated in this matter and the subject of the trial. The Developers began litigating these claims against the City immediately upon being served with the foreclosure petition. The court finds the Developers have failed to establish the amount claimed was solely for the defense of the foreclosure action since that defense entailed the immediate filing of a cross petition against the City on the issues presently before the court.

The district court's factual findings are supported by substantial evidence. We are reviewing the district court's denial of fees for abuse of discretion, and we presume the district court acted within its discretion unless the Developers show otherwise. *Lee*, 906 N.W.2d at 194. The Developers made no such showing. We affirm the district court ruling denying the Developers' request for foreclosure defense fees.

**IV. Disposition.**

For those reasons, we affirm the district court judgment except for the award for tortious interference with an existing contract.

**Appeal Affirmed in Part and Reversed in Part; Cross-Appeal Affirmed.**

All justices concur except McDermott, J., who takes no part.